(37 App. Div. 374.)

### WOERZ v. SCHUMACHER et al.

(Supreme Court, Appellate Division, First Department. February 10, 1899.)

1. TRUSTS—ACCOUNTING—INTEREST—MONEYS DISBURSED BY TRUSTEE.

To compromise a suit by the receiver of an insolvent bank against its trustees, the latter agreed with the receiver to pay him a stated sum in consideration of his delivering to them certain assets of the bank, to be managed and realized on by them, and out of the proceeds to reimburse themselves for the amount paid to the receiver and the expenses of

managing the property, and to pay the surplus, if any, to the receiver. *Held*, that the trustees were entitled to interest on moneys advanced by them in the care and management of the property.

**2. SAME.**

The contract also entitled the trustees to interest on the sums paid by them to the receiver; and this, from the time of such payment, since their right to reimbursement for the sum advanced, with interest, came into existence with the making of the contract, and not merely when the property was sold.

**3. SAME.**

The trustees were entitled to interest on the sums advanced, independent of any provision therefor in the contract, since the contract creating their liability also created a right to reimbursement out of the property.

**4. SAME—COUNSEL FEES.**

The trustees having placed the property in the hands of one of their number, to be by him managed and realized on, the latter was, in an action against the receiver and his co-trustees for an accounting and his discharge, entitled to reimbursement for the fees of his counsel in connection with the accounting, as against both the receiver and his co-trustees.

Appeal from judgment on report of referee.

Action by Ernest G. W. Woerz against Charles A. Schumacher and others for an accounting. From the judgment, plaintiff appeals. Modified.

Plaintiff was a trustee of the Abingdon Square Savings Bank, for which a receiver was appointed in August, 1876. This receiver brought certain actions against the plaintiff and other trustees, and on December 12, 1877, an agreement was entered into, whereby these actions were discontinued, and the claims compromised by the payment of an amount equal to 35 per cent. of the gross liabilities of the bank. In consideration of this payment, the receiver was to turn over to the trustees or their appointee the remaining property of the bank, and the latter were to reimburse themselves for their payment, and, should there be any overplus, refund the same to the receiver. The plaintiff was designated by the trustees to receive and dispose of the property. He brings this action against his co-trustees, the legal representatives of such as are dead, and the substituted receiver of the bank, for an accounting and discharge as trustee of the trust thus created. The contract in question first recites that the trustees are to compromise the claims against them by a payment of 35 per cent. of the liabilities of the bank, making, with a 15 per cent. dividend already paid, 50 per cent. of such liabilities. The 35 per cent. was to be paid in two installments, each of 17½ per cent. Upon the first payment of 17½ per cent., there was to be credited the amount due from one Cassidy, and the amount of a dividend upon the sum of $15,000 advanced to the bank by certain of the trustees. The balance of the 17½ per cent. was to be paid entirely in cash. Upon payment of this first installment, the receiver agreed to turn over all the remaining property, with certain designated exceptions, to the trustees, who were to manage and realize upon the same, and pay the net proceeds to the receiver, in manner provided as follows: "Said proceeds to be credited on the said thirty-five per cent. agreed herein to be paid by said trustees to said receiver, or so much thereof as shall then remain unpaid; and any excess of said proceeds over enough to make, together with said Cassidy proceeds, and said fifteen per cent. dividend, said full payment of thirty-five per cent., is to be also paid to said receiver for the benefit of the creditors of the said savings bank. But if said thirty-five per cent. has been fully paid before said assets, property, and estate has been realized on, and its proceeds received by said trustees, or if the balance due on said thirty-five per cent. shall be less than said proceeds, then said proceeds, or the remainder thereof, which shall remain after paying said thirty-five per cent. in full, shall be applied by said trustees to reimburse themselves for what they have paid on account of said thirty-five

per cent.; and only the overplus (after the payment of the proper expenses incurred by them in and about the management and sale of said property) shall be paid over by them to said receiver." The excepted property is then specified, and it is provided that it shall be held by the receiver "as security for the payment of said full sum of thirty-five per cent. by said undersigned trustees," and that, upon their default, the property may be sold, and the proceeds applied "to said payment of thirty-five per cent." If this sum be paid, then the property is to be conveyed to the trustees, "to be held and disposed of by them upon the condition above mentioned; that is to say, that all that is realized from the assets and property of said savings bank, * * * over and above said full sum of thirty-five per cent., shall be paid by said undersigned trustees to said receiver," etc. The true meaning and intent of the instrument are then stated to be that the trustees shall pay a sum "equal to thirty-five per cent. of the gross liabilities of said bank, * * * with interest computed and adjusted on the same down to July 1st, 1876," and that "all that the said trustees realize from said assets over and above said thirty-five per cent. is also to belong to, and is to be paid over to, said receiver." It is then provided that the property is to be sold by the trustees, and that the "proceeds thereof, after reimbursing themselves for said sum of thirty-five per cent. and the proper expenses of care and sale, are to be paid over to said receiver." It is finally provided: "And it is further agreed that any inconsistent provisions hereinbefore contained are modified accordingly; that after reimbursing themselves out of the proceeds of the assets of said savings bank for the thirty-five per cent. aforesaid to be paid by them, and for the reasonable and proper expenses of managing and realizing on the same, the said trustees, before paying over to the receiver the surplus of said proceeds as above provided, shall retain for their own use, by the way of or in the nature of a dividend thereon, thirty-five per cent. of the fifteen thousand dollars, and the interest thereon, as above provided (as the same are proved as a debt against said savings bank as above provided for), and that the balance of said proceeds, after said reimbursement and said retaining of said thirty-five per cent. just mentioned, shall be paid over to said receiver," etc.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

Samuel Untermyer, for appellant.

Charles F. Brown, for respondent Samuel Wasserman, substituted receiver.

BARRETT, J. 1. The learned referee found that, under this agreement, the plaintiff was not entitled to retain, as against the receiver, interest either on the 35 per cent. paid by certain of the trustees to the former receiver, or on the amounts disbursed by them from time to time in the management and care of the property. The reason he assigns is "that the said agreement does not so provide, but provides for reimbursement only of the sums so paid." This finding brings up the main question presented upon this appeal.

It must be admitted that the agreement in question does not expressly provide for interest upon the sums so paid and expended. The question is, does it so provide by fair implication? To arrive at a just conclusion upon this head, we must look at the circumstances which surrounded its execution, as well as at every clause in the agreement itself. We can thus best ascertain the purpose and intention of the parties, and, having ascertained that intention, construe the agreement in its light, and apply thereto the governing principle. The surrounding circumstances here were special and peculiar. There was no debt due by the trustees to the receiver,

nor did the payment which they made create on his part a debt to them. There was, in fact, not even a liquidated claim against the trustees. There was merely a defended lawsuit. The trustees took the property, with the risk of making themselves whole out of it. Thus, their account current was with the property, not with the receiver. The moment they received the property, it was chargeable with the 35 per cent. Subsequently it was credited with the usufruct, and debited with the further advances. The plaintiff in fact debited himself with interest upon the rents received, and credited himself with interest upon the advances. It seems quite clear that interest was here properly chargeable upon both sides of the account. How else was the actual surplus of the property to be ascertained? According to the learned referee, it is to be ascertained by debiting the plaintiff with interest upon the rents which he received from time to time, and crediting him only with the principal of his payments. This would certainly be most inequitable, and we should expect to find support for it in some express and entirely unambiguous covenant, in terms negativing or excluding interest. Looking at the agreement in all its phases, we find nothing in support of this view save certain expressions which, construed narrowly and literally, might exclude aught else save the precise principal of the 35 per cent., but which do not necessarily point in this harsh direction. We do not think that the formal phrases of this agreement relating to and specifying the 35 per cent. were intended to exclude the operation of the ordinary principles of equity relating to this subject of interest. To exclude their operation would require the use after the provision for reimbursement of some such words as "but without interest."

The courts of this country are more liberal in the allowance of interest than the English. "The leading difference," says Mr. Sedgwick in his work on Damages, "seems to grow out of a different consideration of the nature of money. The American cases look upon the interest as the necessary incident, the natural growth, of the money, and therefore incline to give it with the principal; while the English treat it as something distinct and independent, and only to be had by virtue of some positive agreement." 1 Sedg. Meas. Dam. (8th Ed.) § 292. "Interest," says the same writer (Id. § 282), "bears the same relation to money that rent does to land, wages to labor, and hire to a chattel." In this view it may be safely asserted that, where the question of the allowance or disallowance of interest is not forclosed by the nature of the transaction and the relation of the parties thereto, general equitable principles will be applied to its solution. Each such case, says Chancellor Kent, in Pease v. Barber, 3 Caines, 266, "will depend upon the justice and equity arising out of its peculiar circumstances to be disclosed at the trial." In Reid v. Glass Factory, 3 Cow. 387, affirmed in court of errors, 5 Cow. 587, it was held that a general agent who makes advances to keep his employer's factory in operation, and to carry on his business, is entitled to interest on such advances. "No express authority or direction," says Sutherland, J., "was given to Reid to make the advances; but if they were necessary to keep the factory in opera-

tion, and no provision was made by the company for them, an authority to the agent to procure them was necessarily implied."

In the case at bar the trustees were not actually the receiver's agents in the management of the property, but they were acting for his ultimate benefit, and for the benefit of the depositors of the bank, as well as their own. The receiver and his cestuis que trustent had a right to a proper performance of the trustees' covenants under the agreement, and they could challenge any disposition of the property in hostility to its terms. Woerz v. Rademacher, 120 N. Y. 63, 23 N. E. 1113. The trustees could, under the agreement, sell the property immediately, and thus deprive the receiver and the depositors of all hope for a surplus; or they could, as they did, nurse it carefully, and thus, in the end, produce a surplus. Shall they, because of their good faith and fair dealing, be deprived of interest upon the sums which they were compelled to advance in order to carry the property and keep it in good condition until the sale from which the surplus was realized could be effected? In other words, shall they be punished for their honest endeavor to execute the spirit of the agreement, and to do their full duty thereunder? If authority to make the advances was necessarily implied in the Reid Case, supra, a fortiori it should be implied here. While these advances were being made by the trustees, in a measure for the ultimate benefit of the depositors, the latter had their 35 per cent. dividend, contributed by the trustees, in their pockets, and were enjoying the use thereof. The contention is that they may keep this dividend thus secured, and enjoy the use of it, while the trustees are managing the property with a view to securing for them a further dividend; and yet that the trustees are to have no interest upon the advances necessary to bring about the possibility of this further dividend. Upon this theory, the depositors are, in substance and effect, to have a use which implies interest upon the 35 per cent. paid to them, and also interest upon the rents collected by the trustees, while the latter are to have nothing save the principal of their running advances. We are of opinion that there is nothing in this agreement which contemplates any such injustice as this, and that, when the instrument speaks of the reasonable and proper expenses of managing the property, it impliedly includes interest upon the sums advanced to pay such expenses.

Although the trustees were not bound to make these advances, and although no one was liable to them for their reimbursement, yet the property itself was chargeable therewith, and the surplus can be properly arrived at only by crediting the interest on such advances, and debiting the interest on the rents received. For the purpose of ascertaining the just surplus, the transaction should be treated precisely as though there had been an absolute sale of the property. In fact, the learned referee took this view. He says in his opinion:

"Substantially, they [the trustees] agreed to buy the property from the receiver for a sum certain, and to pay in addition whatever more, if any, its value might in the future be shown to have been by process of realization, and, in return for such purchase and agreement, the receiver agreed to pursue them no further."

The only "process of realization" whereby the owner of the property could determine its true value to him must include the computation of interest, in the ordinary manner, upon the items chargeable against the property, as well as upon those with which it is credited. The surplus was the net profit derived by the trustees from the ultimate sale of the property.

If this conclusion is inevitable, notwithstanding the omission of the words "and interest" after the word "expenses,"—if, in fact, these words, "and interest," are on every just principle implied,—why is not the same conclusion inevitable as to the 35 per cent.? This 35 per cent. went, as we have seen, into the pockets of the depositors. Ever since its receipt they have been presumably gaining, while the trustees have been losing, the interest on it. The depositors have had the trustees' money; the trustees, the depositors' property. The latter, under the agreement, was to be managed and disposed of for the benefit of all concerned,—to reimburse the trustees the 35 per cent., and possibly to realize a surplus. If the literal terms of the agreement—that is, the specification of the principal sums, without the affirmative addition thereto of the words "and interest"—are not to prevent the allowance of interest upon the advances, neither should they prevent the allowance of interest upon the 35 per cent. What the parties contemplated was "reimbursement," in the sense of complete indemnity. The efforts of the trustees under the agreement were to be directed to making themselves whole. If fortunate in the sale of the property, they were to lose nothing by the compromise. They were in that case to be as well off in the end as though they had not made the advances. This is the only reasonable and just interpretation of the agreement; and it is entirely consistent with the special references to interest which we find there. When the sums were definite and liquidated, interest was mentioned. Thus, the dividend of 35 per cent. was to be made upon the specific indebtedness of the bank, with interest computed to a particular date. It was upon the sum to be arrived at by that computation that the dividend was to be paid. Similar reasons for the specification of interest in other instances are apparent from the context. In the case of the 35 per cent., however, there were complicated provisions as to time and manner of payment. It was, as we have seen, to be paid in two installments, each of $17\frac{1}{2}$ per cent. Part of the first installment was to be paid by crediting the trustees with a dividend upon a sum due to them by the bank, and also by crediting them with the proceeds of certain property. The receiver was to retain part of the property until the first installment was paid, and the remainder until the last was paid. This second installment was not to be paid for some 18 months. The word "reimbursement" may well have been used because of these complications, and with the intention of embracing all advances, either made directly or as the result of credits. Instead of referring specifically to each of these credits, and to the payments to be made from time to time thereafter in varying, and, at the moment, uncertain, sums, amounting in the end to the definite 35 per cent., the agreement condenses the entire subject, treats the incidental details as in this connection unimportant, and, with due brevity, simp-

ly speaks of reimbursement for the 35 per cent.,—reimbursement for that payment. Plainly, this meant reimbursement in the broad, adequate, and complete, rather than in the narrow and literal, sense.

But aside from the language of the contract, and the evident intention which it evinces, when we consider the subject-matter and the situation of the parties, the trustees were justified, by established legal principles, in including interest upon the 35 per cent. as an integral part of what they were endeavoring to collect out of the property. The principal argument made against its allowance is, as already pointed out, that this was not a debt which the receiver was bound to repay. On the contrary, it is said, the trustees were paying an obligation of their own. But this view involves essential error. There were disputed claims against the trustees, but, until the contract was executed, there was no settled liability. There was nothing but a contested claim. The same agreement which brought the trustees' liability into existence defined its nature and scope. Their agreement to pay was made only upon the condition that they should be entitled to get back their money out of the property, if that could be done. Their right to get it back was as fully recognized as the receiver's right to have it under the contract. As against the property, why may not the amount paid by the trustees be treated as an existing debt due to them, and chargeable thereon? To the extent of the property, the receiver may not inappropriately be termed a quasi debtor. Murray v. Marshall, 94 N. Y. 611. In the case cited, it was said of one who held property subject to a mortgage, which he had not personally assumed, that he "stood in the quasi relation of principal debtor." Though the property here was actually transferred, the substance of the transaction was not unlike that of a mortgage to secure payment of the sum advanced. The trustees were not its absolute and unqualified owners. They could make no profit out of the transaction. They could only reimburse themselves for their advances and outlay; and the surplus represented what was in its nature the equivalent of the receiver's equity of redemption. These advances and this outlay thus constituted the sum chargeable upon the property,—in effect its debt, and the receiver's quasi debt. Interest should be allowed upon such a charge as in the case of any other debt. It is true that neither principal nor interest was recoverable against the receiver, for he had expressly stipulated against such a result. As against the property, however, the right to the principal is undoubted, and the right to interest, upon settled principles, follows as a natural sequence. If one should borrow money from another, exempting himself from all personal liability, but giving a mortgage for the amount, we think there could be no doubt of the mortgagee's right to collect interest out of the property; and that is substantially this case.

The cases of Chester v. Jumel, 125 N. Y. 237, 26 N. E. 297, and Carey v. Doyne, 5 Ir. Ch. 104, while not directly in point in their governing principles, support this view. In these cases the debtor executed an instrument giving a lien upon his property to secure a debt. No authority was given to collect anything more than the exact amount of the principal, and yet it was held that the property was

chargeable with interest also. It is true that in these cases there was a debtor personally liable for the interest. But this debtor was at liberty to limit the lien upon his property as he might see fit; and he did so in terms; yet the interest was charged upon the land by mere intendment. The debtor said that a certain specific sum might be charged upon the land, and the law added that interest also might be so charged. That seems to be precisely this case. The fact that, in the cases cited, an additional right to collect interest against an individual existed, does not seem in any way to affect the result.

It is argued that, in any event, interest cannot be allowed until the date when the property was sold, because not until then was the sum due to the trustees liquidated. This argument seems to be based upon a complete misapprehension. The sums paid and advanced were fixed and certain. The trustees had a right to recover them out of the property, and this right carried with it the right to interest. Both rights were liable to be defeated if the property failed to produce a fund sufficient for their satisfaction. But these rights did not come into existence with the fund. Each of them existed throughout, and only their satisfaction was postponed.

2. We also think that the plaintiff was entitled to credit for the sum of $4,056.22, the amount of his counsel fees in connection with the accounting, as against both the receiver and the co-trustees. No objection was made to the reasonableness of this charge, and the referee allowed it as between the plaintiff and his co-trustees. The receiver was directly interested in the accounting. He claimed from the plaintiff a much larger sum than the latter conceded to be his due, and the litigation of this question caused much of the expense. The learned referee, in allowing the charge as against the plaintiff's co-trustees, found that:

"The plaintiff was properly entitled to apply to, and justified in applying to, the court to have the intricate questions between himself and the defendants, and between the defendant receiver and the defendant trustees, determined and adjusted, and the several accounts authoritatively taken, stated, passed, and allowed; and there has been no objection to the reasonableness of the amount of said items."

This finding would seem to necessitate, as a legal conclusion, the allowance of the charge as against the receiver, quite as much as against the co-trustees. The plaintiff was bound to account as against the receiver, and the reasonable expenses incident to such an accounting were a proper charge upon the fund. The accounting could not be severed. It was under a single agreement, to which all the defendants were parties. Its object was to settle all questions with regard to the fund, and to liquidate the definite surplus payable to the receiver. We think it clear that this item should have been allowed. Perry, Trusts, § 910; Woodruff v. Railroad Co., 129 N. Y. 27, 29 N. E. 251; Attorney General v. Insurance Co., 91 N. Y. 61.

3. We agree, however, with the learned referee in his disposition of the question of commissions. They were disallowed as against the receiver; we think properly. The plaintiff's services were rendered to his co-trustees, not directly to the receiver. The contract under which the property was transferred was between the receiver and the

trustees generally. The plaintiff was made grantee in the deeds at the request and for the convenience of his co-trustees. The receiver's dealing was solely with the contracting trustees, not specially with the plaintiff. These trustees realized the surplus through efforts made primarily for their own benefit, and but sequentially for the benefit of the receiver. They were engaged throughout in protecting their own personal interests; and the plaintiff was their agent and appointee. We know of no authority which would justify the allowance of commissions to this agent as against the receiver whose contract was solely with such agent's principals.

The judgment should accordingly be modified by the allowance to the plaintiff of interest on the 35 per cent. paid to the receiver from the dates of such payment; also on all sums expended in the management and realization of the property, from the dates of such payments, respectively; and also by the allowance of the item of $4,056.22, for the services of his attorneys and for expenses in this action. As thus modified, the judgment should be affirmed, with costs of this appeal to all parties who have filed briefs in this court to be paid out of the fund; and decree should be molded accordingly. All concur.