CLARKE *v.* CENTRAL RAILROAD & BANKING CO. OF GEORGIA *et al.*

CENTRAL TRUST CO. OF NEW YORK *v.* COMER *et al.*

(*Circuit Court, S. D. Georgia, E. D.* May 14, 1892.)

1. RAILWAY COMPANIES—ILLEGAL CONSOLIDATIONS—TRANSFER OF STOCK—RIGHT TO VOTE.
    The Ga. Co. of North Carolina acquired by purchase a majority of the stock of the Cent. R. Co. of Georgia, which it afterwards deposited with the Cent. Trust Co. of New York, and finally transferred to the Terminal Co., a system composed of several competitive lines of railroad. This company created a directory of the Cent. R. Co. to suit its purposes, which directory leased the Cent. R. R. to the R. & D. R. Co., a competing line. The lease was enjoined as contrary to Const. Ga. 1877, art. 4, § 2, par. 4, prohibiting the merger of competing corporations. The injunction order directed the election of a new board of directors for the Cent. R. Co., and provided that the stock of the company controlled by the Terminal Co. should not be voted in such election unless transferred in good faith. The stock in question consisted of 42,000 shares, 40,000 of which were those deposited by the Ga. Co. with the C. Trust Co. and transferred to the Terminal Co., and the remainder, 2,200 shares, acquired by the Terminal Co. from other sources. The Terminal Co. and the Ga. Co. filed a paper relinquishing to the Cent. Trust Co. any right they might have to vote such stock. *Held*, no interest in the stock appearing in the Cent. Trust Co., other than that of a mere stakeholder, that the relinquishment in question did not entitle it to vote.

2. SAME—INCAPACITATING TRUST.
    The Cent. Trust Co. was also incapacitated to vote such stock by the fact that it was trustee for a large amount of indebtedness of the Cent. R. Co., and, besides, its charter apparently gives no such power.

3. SAME.
    The Cent. Trust Co. was unfit to be intrusted with the voting power in question because of the fact that its president, a financial expert, was engaged in an attempt to bring about a merger of the Cent. R. Co. with competing lines of railroad in the state of Georgia, and place them under the sole control of the Terminal Co., contrary to the constitution of the state.

4. SAME—COMITY BETWEEN THE STATES.
    Comity between the states will not authorize a foreign railroad corporation to exercise powers within the state which a domestic corporation would not be permitted to exercise under the constitution and policy of the state.

5. SAME—COMPETING CORPORATIONS—ACQUISITION OF STOCK.
    The fact that the charter of the Cent. R. Co., granted before the adoption of the constitution of 1877, permitted municipal corporations to purchase its stock, would not authorize a competing corporation to acquire such stock after the adoption of the constitution.

6. SAME—DISQUALIFYING INTERESTS.
    The fact that the Terminal Co. has no appreciable interest in the stock of the Cent. R. Co., because of a mortgage on the railroad executed by the Terminal Co., does not remove the objection to its voting in person or by representative in the election of the directors of that railroad company, in view of the fact that it has large pecuniary interests in two directly competing lines of railroad.

In Equity. Bill by Rowena M. Clarke against the Central Railroad & Banking Company of Georgia and others, and bill by the Central Trust Company of New York against H. M. Comer, receiver, and others. Motion by the Central Trust Company to modify an interlocutory decree. Motion denied.

*Butler, Stillman & Hubbard* and *H. B. Tompkins*, for the motion.

*Lawton & Cunningham, Denmark, Adams & Adams, Daniel W. Rountree, Marion Erwin*, and *A. O. Bacon*, opposed.

SPEER, District Judge. It is essential to a clear understanding of the questions involved in this motion that a brief statement be made of the

proceedings heretofore had in the equity cause in which the motion is presented.    It is also essential to direct attention in the outset to paragraph 4 of section 2, art. 4, of the constitution of the state of Georgia. This clause of the constitution is as follows:

"The general assembly of this state shall have no power to authorize any corporation to buy shares or stock in any other corporation in this state or elsewhere, or to make any contract or agreement whatever with any such corporation, which may have the effect, or be intended to have the effect, to defeat or lessen competition in their respective businesses or to encourage monopoly; and all such contracts and agreements shall be illegal and void."

The constitution in which this clause is found was adopted in the year 1877.    It was evident at that time, and has become more plainly evident since then, that it was indispensable, by comprehensive and imperative enactments of fundamental law, to arrest the tendencies of corporate bodies towards abnormal and destructive aggregations of power; tendencies which could not have been foreseen, and which therefore had not been restricted and limited by the legislation of the past; tendencies which endanger the salutary purposes for which such corporations were created by the state, and which threaten to inflict upon vast multitudes of the people the most destructive injustice and injury,—injustice and injury against which it is obviously the duty of the government to afford them protection.    It would be perhaps difficult to express in such narrow compass a restriction of corporate power more conclusive in its inhibitory effect, or more difficult to evade by those who for any motive would seek to avoid its legal force.    *Langdon* v. *Branch,* 37 Fed. Rep. 449; *Hamilton* v. *Railroad Co.,* 49 Fed. Rep. 412.    The original bill and interventions filed in this cause seek to apply to the facts of the case the legal effect of this constitutional provision, and, further, to invoke the doctrine following, announced with great force and clearness by Mr. Justice GRAY in the supreme court of the United States in the case of *Central Transp. Co.* v. *Pullman's Palace Car Co.,* 139 U. S. 46, 11 Sup. Ct. Rep. 489:

"A contract of a corporation which is *ultra vires* in the proper sense, that is to say, outside of the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void and of no legal effect.    The objection to the contract is not merely that the corporation ought not to have made it, but that it could not make it."

Further:

"That the lease by one corporation of its property and franchises to another corporation is unlawful and void, because beyond the corporate powers of the lessor, and involving an abandonment of its duty to the public."

It appears from the record before the court that on or before the 30th day of May, 1887, certain persons formed a design to obtain control of a majority of the capital stock of the Central Railroad & Banking Company of Georgia.    While this company has assets amounting to many millions of dollars, its capital stock is only $7,500,000.    For the purpose of retaining an exemption from state taxation granted by the original charter the capitalization of the stock had been preserved at that com-

paratively low figure. From this fact it became relatively an easy matter to obtain a majority of the stock bearing the voting franchise. To accomplish this purpose, D. Schenke, Samuel H. Wiley, and Thomas B. Keogh organized, or attempted to organize, at High Point, in North Carolina, a corporation bearing the significant name of "The Georgia Company." The charter was granted by the clerk of the superior court of Guilford county, and the business of the company was, as therein stated, "to purchase, acquire, and to hold, or guaranty, to indorse the bonds or stocks of any railroad company in this or any adjoining state; to lease any railroad in this or any adjoining state; to engage in ... business of transportation, and to operate railroads in this and adjoining states; to aid any railroad company in this or any adjoining state; 'except building any railroad,' which is forbidden in said statute." The charter does not appear to have any validity. See St. N. C. Acts 1885, p. 70. This appears to be both a banking and railroad corporation, and such corporations can be created by the legislature only.

It appears, however, that the persons mentioned in the original bill, who had bought about 40,000 shares of the stock of the Central Railroad & Banking Company of Georgia, turned over their entire holding to said Georgia Company; and it was further stipulated and agreed that this stock should be held in a block, with the view to permanently control the management of the Central Railroad and its properties. Thereafter it appears that the Georgia Company deposited with the Central Trust Company of New York its entire holding of this stock, and had issued thereon and sold to the public four millions of the bonds of said Georgia Company. In the mean time, by virtue of its majority control, it had taken charge, through a president and board of directors elected in the main by this block of stock, of the Central Railroad & Banking Company of Georgia. Thereafter the Georgia Company transferred all of its capital stock to the Richmond & West Point Terminal Railway & Warehouse Company. This latter company thus came into control of the Central Railroad & Banking Company. It also had control of the Richmond & Danville Railroad Company, and of the East Tennessee, Virginia & Georgia Railway Company, both of which are directly competitive lines of the Central Railroad & Banking Company. The Terminal Company (as we shall call it for the sake of brevity) now put out, through the Central Trust Company of New York, a large issue of its bonds, secured by a mortgage deposited with the Central Trust Company, on its stock holdings, in all the properties under its control.

With reference to the 40,000 shares of stock of the Central Railroad deposited with it as collateral to secure the bonds of the Georgia Company, it was stipulated in the mortgage that whenever the Terminal Company presented a bond of the Georgia Company the Central Trust Company should issue in lieu thereof a bond of the Terminal Company. Two millions of the bonds of the Terminal Company were left on deposit with the Central Trust Company, with the avowed purpose of procuring by the use of said bonds the 32,000 shares of stock of the Central Railroad, which had not yet been secured by the Terminal Company or the pro-

moters of the scheme to possess and control the Central Railroad & Banking Company of Georgia. The Central Trust Company thus became the trustee for this mortgage, a salient feature of which was the design to compass the absolute and undivided ownership of the Central Railroad by a company controlling rival lines, largely by means of the use which had been made of a majority of its stock held in a block by this contract or voting trust, apparently a corporate purpose to obtain $3,200,000 in stock of a company it controlled for $2,000,000. The Terminal Company had obtained elsewhere 2,200 shares of stock, which it likewise deposited with the Central Trust Company; and with regard to all of this stock, thus deposited, it was stipulated by the promoters of the scheme that its voting power should be retained by the Georgia Company, and afterwards, when the Terminal Company absorbed that, by the latter. By means of this voting power the Terminal Company was now the master of the destinies of the Central Railroad, and its president and board of directors had become a directory which was in the control of the Terminal Company, and, if need be, removable by it. In pursuance of the scheme, this directory on the 1st day of July, 1891, leased for 99 years the Central Railroad & Banking Company of Georgia, and all of its property, nominally to the Georgia Pacific Railroad Company, but really to the Richmond & Danville Company, both of which were under the control of the Terminal Company, which now directed the operation of all the Central properties, with the most disastrous results to the immense and vital system of which it had thus become possessed. This lease and the proceedings of those in charge of the control of the Central Railroad & Banking Company are attacked by the original bill. A temporary receiver was appointed. While this officer was proceeding to take possession of the assets of the Central Railroad & Banking Company the Georgia Pacific and Richmond & Danville Companies threw up the lease, and formally abandoned the possession of all the properties. At the hearing of the rule to show cause why the injunction prayed for should not be granted, and the receiver appointed, after an investigation lasting through several days, the court (Judges PARDEE and SPEER presiding) granted an interlocutory order appointing receivers to take charge of the properties and assets of the Central Railroad & Banking Company, and all subsidiary railroads and steamship companies. The order directed an election for a board of directors to be held on the 16th day of May, 1892, and it enjoined the Central Railroad & Banking Company from receiving the vote of the 42,200 shares of stock controlled by the Terminal Company, and held by the Central Trust Company of New York. It provided, however, that, in case there should be a transfer of that stock in good faith, it might be voted, provided that the court approved the genuineness and legality of the transfer.

The proceeding now before the court is brought to have that order modified, so that the stock may be voted by the Central Trust Company and counted in the election on Monday next. The motion involves the control of the Central Railroad & Banking Company of Georgia, and the many millions of property which constitute its assets. The Central Trust

Company is a party defendant to the original bill, and, in the opinion of the court, might well be held to be bound by the former adjudication. Its counsel were present at the hearing.    The cause had been continued in part upon the application of its counsel; they stating that they desired to be heard.    It being insisted, however, that the situation of this stock has been changed since that judgment was rendered, the court has heard its application.    There are now presented on the part of the Central Trust Company two written representations, one signed by the Georgia Company, by T. W. Scarborough, president, and the other by the Richmond & West Point Terminal Railway & Warehouse Company, by John A. Rutherford, second vice president.    The representations both recite the fact of the deposit of the 40,000 shares of Central Railroad stock with the Central Trust Company for the purpose of securing the bonds above mentioned, and they both contain this further statement:

"It may be claimed that the adjudication by your honorable court bears the construction that this company shall not exercise the right to vote upon the said stock reserved by the said deed of trust, and in view of such decision this company yields, transfers, and surrenders any right which it possesses or possessed to vote upon the said stock, or any part thereof, at the election of the shareholders of the Central Railroad & Banking Company of Georgia to be held May 16, 1892, or at any adjournment thereof, in favor of the said Central Trust Company, representative of the said bondholders, the legal and equitable owners of the said 40,000 shares of stock.    In making this surrender of any right to vote upon the said stock, the Georgia Company represents to the court that it has not entered into any arrangement, bargain, or understanding of any kind or nature whatsoever with the said Central Trust Company in respect to the exercise of the voting power upon the said stock by that company, and that it will not make or endeavor to make any such bargain, contract, or arrangement, and that the said Central Trust Company shall be entirely free, independent, and untrammeled, so far as the said Georgia Company is concerned, from any direction, interference, or control in the exercise by it of such voting power."

The representation of the Terminal Company purports only to surrender the voting right in 2,200 shares of stock.    Both representations restrict the transfer of the voting right reserved by the Terminal Company to the election to be held on May 16, 1892, or at any adjournment thereof.   It is difficult to perceive how this instrument differs in any matter of substance from an ordinary proxy.    The transfer of the Georgia Company of its right to vote the stock is not considered by the court as material, for that company has really no control over the stock to which a court of equity will pay any attention.    The Georgia Company has been wholly absorbed by the Terminal Company, but the Terminal Company omits to make any transfer of the right to vote the 40,000 shares of stock in question, and limits its representation to the court to 2,200 shares, which it has presumably acquired from sources other than the Georgia Company.    It follows, therefore, that as to 40,000 shares of this stock the condition is precisely the same 'as when the court enjoined the Central Railroad from receiving or counting the votes thereof, for the reason that it had been purchased and held in violation of the laws and constitution of Georgia.    But, as we have seen, the transfer of

the Terminal Company relating to 2,200 shares is nothing more than a proxy; and, the Terminal Company being enjoined from voting the stock directly, it cannot be permitted to vote it by proxy, unless, indeed, it is thought proper to set aside the former judgment of the court in this respect. There appears to be no consideration whatever for this transfer. The Central Trust Company of New York holds this stock merely as a naked trustee to secure certain bonds for which it was pledged as collateral security. Now, when those bonds were issued the stock thus pledged had attached to it no voting power, of which either the Trust Company or the bondholders had the right to avail themselves. Its voting power, therefore, was no part of their security. This transfer, even if it were efficacious to convey the voting franchise of all the stock, would be merely an attempt to ingraft upon the trust a new feature, which the beneficiaries of the trust did not seek, or expect, at the time of its creation. The voting of the stock was enjoined because it was deemed by the court that it would bring about a public wrong, the gravity of which cannot well be foretold. It was further deemed to threaten the continuance and perhaps the aggravation of the illegal and injurious results it had already accomplished. If the Central Trust Company was wholly relieved of any entanglement, with the perplexed and chaotic condition, which the voting power of this block of stock, and the illegal, reckless, and destructive management, its exercise, has entailed upon these properties, the court would even then hesitate long before it would avoid the injunction, which was the outcome of the most anxious consideration by the learned circuit judge, and by the district judge, merely because the Terminal Company, enjoined from voting itself, had gratuitously conveyed to the Trust Company the power which the latter apparently had not desired, and which was in no sense a part of the contract with its bondholders. But the Central Trust Company is not, in our opinion, in any view, a proper party to vote this stock. It has no interest of its own in the stock. It is simply a stakeholder. There are many situations in which stock may be so placed that it becomes inequitable or illegal for it to be voted. The law places the voting power of pledged stock in the pledgor or mortgagor, even where there is no express stipulation to that effect. *Schofield* v. *Bank*, 2 Cranch, C. C. 115; *Vowell* v. *Thompson*, 3 Cranch, C. C. 428. And where the pledgor or mortgagor is disqualified to vote the stock the disqualification extends as well to the pledgee or trustee. *Ex parte Holmes*, 5 Cow. 426; 1 Woods, Ry. Law, § 61, p. 149, and cases cited. See, also, *Bank* v. *Sibley*, 71 Ga. 726; *Burgess* v. *Seligman*, 107 U. S. 20, 2 Sup. Ct. Rep. 10. It may well be doubted if the charter of the Central Trust Company affords any authority for the exercise of such a power. It is what its name imports, a trust company, and, as was well said in the argument of one of the counsel, if the Central Trust Company "springs from the passive position of a naked trustee into the active operation of a great railroad system," the court must be clearly satisfied of its authority by law to do so. If it may do this, it has within its gift the appointment of every officer of this vast railroad system, from president to flag-

man; and all the vast and most important powers of the railroad, powers in which the people of states distant from the office of the Central Trust Company are profoundly concerned, are likewise within its control. It is moreover the trustee, as we are informed by its counsel and as it appears from the evidence, for twenty-six millions of the indebtedness of this road. It is, then, the agent for its creditors. Can it also be the agent for the debtor? If so, it is easily possible that when the agent of the creditor perceives a debt to be due the agent for the debtor may make default, and thus the entire property be brought to the block. In stating this possibility, no reflection is intended on this great financial institution, but the law will not permit conflicting trusts or conflicting interests to be reposed in one trustee.

Besides, it appears from the evidence that the accredited president of the Central Trust Company is and has been concerned as the financial expert seeking to bring about a consolidation and reorganization of all the railroads which are or have been under the control of the Terminal Company. These roads operate the competing lines in the state of Georgia, and in the statement of March 1, 1892, addressed by Mr. Frederick P. Olcott, president of the Central Trust Company, to the holders of securities of the Terminal Company, this appears:

"In view of the pending litigation affecting the Central Railroad & Banking Company of Georgia, and questions which are before the courts undetermined respecting its existing lease, and considering the legal difficulties attending a consolidation embracing that company, the committee has found it advisable to make no provision for the present for taking up the outstanding stocks or securities of the Central Railroad & Banking Company of Georgia, but the interest of the Richmond Terminal Company in these stocks and securities will vest in a new corporation, and form a part of the security on a new first mortgage bond."

The East Tennessee, Virginia & Georgia securities will be covered by the same mortgage, and the two roads will be under the same control. Can it be denied that this avowed purpose would have the effect, or be intended to have the effect, to defeat or lessen competition, and to encourage monopoly? And yet with the voting power of this stock in its control the Trust Company can accomplish this result. Not only is this true, but if it be competent for the Central Trust Company to operate one railroad system of which it holds securities, if a few words from the mortgagor, transferring the voting power of stocks pledged with it, can give it control, what it may do with one road it may do with another. If it may vote the stock of the Central, it may vote the stock of the East Tennessee, Virginia & Georgia, the Louisville & Nashville, and all the others, and thus the railroads of an entire section may be the playthings of the officers of this corporation. Surely this may tend to defeat or lessen competition and to encourage monopoly. But whatever may be the powers of the Central Trust Company elsewhere, it certainly cannot exercise such powers as we have described within the state of Georgia. A corporation of this state could not do so. Comity between the states authorizes a corporation to exercise its charter powers within another state, but it does not permit the exercise of a power where the policy of

that state, distinctly marked by legislative enactments or constitutional provision, forbids it. *Runyan* v. *Coster*, 14 Pet. 122; *McDonogh* v. *Murdock*, 15 How. 367; *Marshall* v. *Railroad Co.*, 16 How. 314.

It is said, however, that, by the charter of the Central Railroad & Banking Company, other corporations may own stock in that company. It is quite evident that the language upon which counsel for the movant rely relates to corporations of the classes mentioned in the charter. The cities of Macon and Savannah are mentioned, and other corporations are authorized. Under a familiar rule of construction, this would seem to mean other municipal corporations. Be this as it may, if any other corporation had not purchased the stock before the constitution of 1877, such other corporations cannot since then buy it, or hold it on any contract or agreement whatever which might have the effect, or be intended to have the effect, to defeat or lessen competition or to encourage monopoly. This would be especially true of a nonresident corporation, which, when it enters the state, does so with submission to the settled policy of the state. The court recognizes the soundness of the authorities cited by the learned counsel for movant in argument. It is, however, true that they do not apply to a case like this. It is perhaps true that there is no precedent precisely pertinent to the grave issues presented by this controversy. They have sprung into existence because of the marvelous railroad development of the country, and because of the ease and facility with which a trust owning a bare majority of the stock of a corporation can nullify and deaden the vote of all the minority stock, however great the minority, or however rightful and intelligent would be its exercise. The alarming effect of this power may be illustrated by the facts of this case. Forty thousand shares of stock have deadened the votes of 32,000 shares, and have controlled as many millions in values. These 40,000 shares have been deposited, and bonds issued thereon. If the voting power of the stock is apportioned among the bonds, 20,100 shares may control the policy of the entire block, and these 20,100 shares may thus control all the millions belonging to the Central properties, and yet stockholders who have 32,000 shares have no voice in the management of the properties, in which perhaps their all is invested.

Even where individuals form a combination to control the majority stock of a corporation, and agree not to transfer their shares to the opposition or not to vote against the combination, such contracts have been held to be void as in restraint of trade, and against public policy. Ordinarily any stockholder may withdraw from such a contract, although it is expressly agreed that it shall be irrevocable. 1 Beach, Priv. Corp. § 305, and cases cited.

It is insisted by the petitioners that the Terminal Company has no appreciable interest in the stock of the Central Railroad. The interest it formerly had was conveyed by the mortgage of 1889. The bonds executed under that mortgage, and secured by the Central stock, have long ago been sold, and the proceeds appropriated by the Terminal Company. But that company has a substantial and large pecuniary interest in the

Richmond & Danville and the East Tennessee, Virginia & Georgia Railroads. These roads are the natural competitors of the Central. Is it surprising, then, that the Terminal Company, controlling by this "voting trust" the management of the Central, should make the road in which it is not interested suffer for the benefit of its rivals, which it not only controls, but possesses? It is not difficult to perceive that a combination of corporations which produces a condition so inequitable cannot be sanctioned by the law. We believe that transactions of this character are within the spirit, if not within the letter, of the act of congress, known as the "Sherman Anti-Trust Law." Act July 2, 1890, (26 St. at Large, p. 209.) It certainly is, as we have seen, obnoxious to the law of Georgia, and it was certainly as obnoxious to the common law. The baleful effects of such an unlawful scheme have been most significantly illustrated by the record itself. The property of one of the oldest and most renowned railroads in the United States has been brought to the verge of ruin. These stocks were once so solvent and reliable that trust estates, the property of widows and orphans, of charitable and eleemosynary institutions, were invested in them, at the will of the trustees, without an order of court to sanction the investment. The properties have been impoverished in every department. Skillful artisans and mechanics, who from their apprenticeship have been in the service of the companies, have been turned away. Vast buildings which were once musical with the whirr of machinery and the voices of prosperous and contented workingmen, earning by their useful and valuable labor a comfortable livelihood, are now voiceless. The ashes sleep undisturbed on the forge, and the hammer rusts on the anvil. Merchants and tradesmen who have depended upon the purchasing power of these operatives have been threatened with ruin; numberless houses once occupied by their happy families are now vacant; and those whose all is invested in the securities of this company are haunted with the expectation that the road may default upon its obligations, and be sold under the hammer on foreclosure, and the provision made for their declining years swept from existence. But this, and all of this, is unimportant, compared with the the greater interest of the people in their rightful demand that the corporation created by them, and granted vast and valuable franchises, shall be managed as a railroad upon lawful business principles, in the transportation of freight and passengers, and for the development of the state, and that it shall not be the toy of the speculator, and that the franchises which they granted for nobler purposes shall not be made the instrument of their ruin and the degradation of the state. The possession of its stock does not give uncontrollable right in the management of a railroad corporation. The right of the state that the corporation should conform to the purposes for which the law created it is wholly paramount to any and all rights of stockholders. It may not be doubted that the values represented by these 42,000 shares of stock are entitled to the protection of the court, and they will be protected. When it is offered to vote them with the legitimate purpose for which the majority of shares of stock in a corporation may be lawfully voted, at the instance

of parties who have legal authority to hold and vote them, they will be voted. The court will be, moreover, happy to entertain any proposition for voting them which will result in the management of this road in such manner that it need not be wrecked; in such manner that its matchless properties may be utilized to pay its obligations as they mature, and to protect its values. It is well understood by the court that the mere fact that this stock may not be voted in its present illegal *status* is a menace to the credit of the Central Railroad, and to the power of the court and of its receivers to redeem it for the benefit of all concerned. We have no doubt that, properly managed in accordance with the law, with the encouragement of those who are friendly to it, which its great importance deserves, the Central Railroad & Banking Company cannot only pay its obligations as they mature, but rehabilitate its fortunes, imperiled as they are by this illegal trust voting a majority of the stock, the exercise of which the court has enjoined. The court is quite as solicitous to protect the interest of the creditors as of stockholders of this great property, but there is nothing in this motion which will justify the court in changing the order, which was mainly, indeed, we may say almost wholly attributable to the wisdom, experience, and acumen of the learned circuit judge; an order intended to preserve the property for the present, to gather anew its dissipated assets, and to restore it as speedily as possible to the lawful charge of those who may be found legally entitled to its management and control. Let an order be taken, denying the application.