## In re ERIE LUMBER CO.

(District Court, S. D. Georgia, W. D. September 26, 1906.)

1. BANKRUPTCY—CLAIMS ENTITLED TO PRIORITY—WAGES OF LABORERS.

In the distribution of the assets of a bankrupt manufacturing corporation whose business has been continued by receivers under orders of the court of bankruptcy, wages due laborers for labor performed within three months prior to the bankruptcy, and also under the receivership, will be given priority over all other liens or claims, except taxes.

2. SAME—ATTORNEY'S FEES.

Under Bankr. Act July 1, 1898, c. 541, § 64b (3), 30 Stat. 563 [U. S. Comp. St. 1901, p. 3447], fees of attorneys for the petitioning creditors in a proceeding in involuntary bankruptcy are allowable and given priority as a part of the cost of administration, and such claims rank next after the wages of laborers, taking precedence, subject to tax claims, of all other mortgage or other liens on funds in the hands of the court for distribution.

3. SAME—CLAIM OF MORTGAGE NOT PARTY TO PROCEEDINGS.

A mortgagee of property of a bankrupt, who had no notice of the bankruptcy proceedings in which, at the request of the other parties interested, the business was continued at a loss and the property sold, is entitled to priority of payment from its proceeds after they have contributed ratably to the payment of labor claims and the costs of administration.

4. SAME—APPOINTMENT OF RECEIVERS—RECEIVERS' CERTIFICATES.

Under the authority given by Bankr. Act July 1, 1898, c. 541, § 2 (5), 30 Stat. 546 [U. S. Comp. St. 1901, p. 3421], to continue the business of bankrupts by receivers, courts of bankruptcy have implied power to authorize the issuance of receivers' certificates to provide funds necessary for operating expenses.

5. SAME—MORTGAGEE—ACQUIESCENCE IN RECEIVERSHIP.

A mortgagee of a bankrupt who has notice of and participates in the bankruptcy proceedings, and makes no objection to the appointment of receivers to continue the bankrupt's business, but does a banking business with the receivers, is thereby precluded from insisting on the priority of his mortgage over the operating expenses or other obligations incurred by the receivers under orders of the court in carrying on the business which was intended to conserve his security.

6. SAME—ALLOWABLE CLAIMS—UNLIQUIDATED CLAIM FOR DAMAGES AGAINST RECEIVERS.

An unliquidated claim for damages for breach of a contract by receivers of a bankrupt is not entitled to priority as against antecedent liens against the estate.

150 F.—52

7. SAME—UNAUTHORIZED INDEBTEDNESS CONTRACTED BY RECEIVERS.

Where an order appointing receivers to continue the business of a bankrupt authorized them to borrow money and incur obligations in an amount not exceeding $3,000, as might thereafter be directed by the court, and the court subsequently authorized them to issue receivers' certificates to the amount of $3,000, such order was notice to all dealing with the receivers that they had no authority to contract further indebtedness, and persons who thereafter sold them property on credit in excess of that amount cannot have priority of their claims therefor against the estate.

8. SAME—CONTINUING BUSINESS.

The power to continue business of a bankrupt corporation through a receiver or trustee implies the power to make debts, to provide for their payment, and to borrow money for urgent necessities.

In Bankruptcy. On exceptions to report of special master fixing priorities of claims.

Walter A. Harris, for Charles Schimmelfing, mortgagee.

John P. Ross, for Citizens' Bank of McRae, mortgagee.

Lane & Park, for American National Bank, holder of receiver's certificates.

George S. Jones and William E. Martin, Jr., for creditors furnishing supplies to receivers.

Merrill P. Callaway, for bankrupt.

SPEER, District Judge. The Erie Lumber Company had its manufacturing plant near Lumber City, in this district. It was a venture of an important character in the manufacture of lumber. In addition to the sawmill, there was extensive machinery for the manufacure of veneering, which is largely used in furniture and cabinet work. The plant was under the control of one Alfred Short, who represented certain interests, and Sylvester J. Tinthoff, who represented others. There was an utter disagreement between these men, and finally Tinthoff, who represented the creditors, filed a proceeding praying that the Erie Lumber Company be adjudged an involuntary bankrupt. This petition was filed on November 8, 1904. Shortly thereafter the creditors filed an ancillary petition for the appointment of a receiver. It alleged, among other facts, that the property of the company consisted principally of steam sawmills, planing mill, veneering mill, kilns, lumber, logs, and timber; that a great deal of timber had been felled and was lying in the woods unprotected; that this was subject to be carried off and appropriated; and that there were other properties consisting of mules and live stock used in connection with the mills which were not receiving proper care. The representations of the petition were of that urgent character which induced the action authorized by the bankruptcy law, and the court appointed the marshal to take charge of the property and assets and preserve them. Thereafter Alfred Short, secretary and treasurer of the company, filed an answer in its behalf. This answer, however, was subsequently withdrawn. It denied the bankruptcy, and charged that the original petition had been collusively brought. There had been, as stated, great friction between the Short and Tinthoff interests. It seemed now that this would be removed. An agreement was drawn, signed by counsel representing Short, party of the one part, and the petitioning creditors, of the other part. The

agreement provided that the parties should jointly apply to the court for an order providing for the operation of the business by joint receivers, according to the stipulations outlined in the agreement. A pertinent clause is the following:

"Alfred Short and Sylvester J. Tinthoff, by leave of the court, are to be appointed joint receivers of the Erie Lumber Company, and shall be by the court authorized to carry on the business of the said Erie Lumber Company as a going concern under the provisions of the acts of Congress relating to bankruptcy. In the apportionment of the duties between the said receivers, the said Sylvester J. Tinthoff shall keep and have charge of the books and correspondence of the said receivers operating said company, and shall be responsible for the correct keeping of said books. The said Alfred Short shall give his entire time to the business of operating the saw-mill and plant, and both receivers shall be consulted and shall act jointly in the operation of the business; and that no money obligations shall be incurred except by the joint act of both receivers, and no money shall be paid out except upon check signed by both receivers."

The recital of the agreement was that it was "advantageous to the said Erie Lumber Company and its creditors that said business be conducted by receivers of the court of bankruptcy." All parties at interest represented to the court that it was highly advantageous, both to the bankrupt and to the creditors, to keep the estate as a going business, and, having been convinced that this was true, on December 21, 1904, by a decree of that date, the agreement was approved and made effective. The order authorizing this policy was carefully considered and was drawn with great care. It attempted to guard the interests of all the creditors, and to provide for every reasonable contingency which could be anticipated. Substantially the full order is as follows:

"It appearing to the court, from the representations of parties at interest, and from the facts agreed upon by the petitioning creditors and the debtor in bankruptcy, the Erie Lumber Company, that it is necessary in the best interests of the estate of the said Erie Lumber Company and of all persons interested therein as creditors or stockholders that the business of the said Erie Lumber Company be conducted by receivers, and that it is absolutely necessary for the preservation of said estate that the property of the said Erie Lumber Company be taken charge of and held by receivers, with full power and authority to conduct and operate its business as a going concern, and that great loss will accrue if the mills and the business of said company should remain idle and shut down during the pendency of bankruptcy proceedings, it is thereupon ordered by the court, that, in lieu of the custodian heretofore appointed by the court to take charge of the property of the said Erie Lumber Company, Alfred Short and Sylvester J. Tinthoff be, and they are hereby, appointed joint receivers of the said Erie Lumber Company; and the said Alfred Short and Sylvester J. Tinthoff as receivers of this court are hereby authorized and directed to carry on the business of the said Erie Lumber Company as a going concern until the further order of the court. And it is ordered that said receivers shall, as early as practicable, put in operation the sawmill, the planing mill, and the veneer mill, and shall continue to operate said mill business, including the purchasing and stocking of said mills with logs, and they also have authority to conduct and carry on in connection with said mills a commissary in the usual way such commissaries are conducted, if they deem it expedient.

"It is ordered that, for the purpose of starting the operation of said mills and the defraying of necessary expenses until such time as moneys shall be coming in from the operation of the business sufficient to defray expenses of operation, and the said receivers shall have authority to borrow money and incur obligations to an amount, however, not to exceed, in the aggregate $3,000, and for the purpose of preventing unnecessary expense in the carrying

on of said business, it is by the consent of both parties ordered that the said Sylvester J. Tinthoff, one of said receivers, shall keep and have charge of the books. * * *. And the said Alfred Short shall give his entire time to the business of operating the mills and plant, but this order shall not be construed as in any way limiting the responsibility of both receivers for the proper carrying on of said business, and both receivers shall be consulted and shall act jointly in the operation of the business, and no money obligations shall be incurred except by the joint act of both receivers, and no money shall be paid out except upon check signed by both receivers, provided, however, that the receivers shall borrow no money except upon order of the court after presenting a petition, and making a showing of the necessity therefor. And, in order to the convenient carrying on of said business as a going concern, said receivers are authorized to make deposits and carry a bank account in such bank, located at McRae, Georgia, as they shall select, which bank shall enter into a bond in the sum of fifteen thousand dollars to insure its continued solvency and the safety of the funds intrusted to it; and said receivers shall have authority, upon their joint check, to pay out all necessary operating expenses, not to exceed $7,000 per month without special orders of the court, such operating expenses including pay rolls for labor, purchase of logs and the stock of said mills with logs, the cost of necessary supplies, costs of necessary repairs, purchase of goods for commissary, cost of books and necessary stationery, personal expenses of the receivers, and said receivers shall be entitled to draw monthly on account by way of salary $100.00 each per month during the operation of said mills and the carrying on of said business, until otherwise ordered by the court, which said salary allowance shall be on account against such compensation as may be ultimately fixed by the court for the services of such receivers.

"And, it appearing to the court that upon certain logs at the mills and upon the banks of the river and floating in the river, liens are held and claimed which it will be necessary to pay off and discharge in order that said logs may be used by the receivers without let or hindrance, and that thereby said Erie Lumber Company may save the amount of money already invested by it in said logs, and that, in order to obtain logs in future, it is necessary that the claims of the persons furnishing said logs shall be paid as a part of the operating expenses, it is ordered by the court that the said receivers are hereby given authority to pay to the persons furnishing said logs or holding liens or claims on logs furnished the amount of their respective claims, to the end that said mills may obtain logs without delay, let, or hindrance. And it is ordered by the court that said receivers shall make reports to the court at least once a month of all receipts and disbursements and as accurately as may be the profit or loss in the operation of said mills. And it is ordered further that if at any time it shall appear that said business is unprofitable and is being operated at a loss, said receivers shall report said fact to the court, to the end that proper steps may be taken to discontinue the operation of said business and incurring of further loss.

"It is ordered that the provisions of this order, unless hereafter modified by the court, shall continue of force for the term of six months from this date. It is ordered that said receivers, before entering upon the discharge of their duties, shall individually give bond for the faithful performance of their duties as receiver, in the sum of seven thousand five hundred dollars each.

"It appearing to the court that petitioning creditors and the said debtor in bankruptcy have entered into an agreement as to the necessity of operating said mills by receivers, it is ordered that said agreement be, and the same is hereby approved by the court, and that the same be filed in said cause."

Short and Tinthoff at once took charge as receivers. Pursuant to the order above set forth, on January 5, 1905, they presented to the court a petition with recitals and prayer, as follows:

"There is an amount due to George F. White, United States marshal, for taking care and preserving the property, * *. * upwards of six hundred dollars; also, that it is necessary, in order to keep labor in their employ,

that an investment of four or five hundred dollars be made for the commissary of said company; also, that there is certain logs and timber which it is necessary to have for the mills of said company that will require an additional expenditure immediately of five or six hundred dollars; that the pay roll at the end of the first month, over and above the supplies furnished for the men, will require at least one thousand dollars, and your petitioners pray that they shall have authority to issue obligations for the purpose of carrying on this business and secure the money upon the same to an amount not to exceed three thousand dollars."

This was in the opinion of the court essential to the proper conduct of the business, and was granted. The receivers were "authorized to issue receivers' certificates or obligations to an amount not exceeding three thousand dollars for the purposes in said petition set out, the payment of said certificates or obligations to be provided for by this court in its final order in said cause unless paid by the receivers out of the income of said Erie Lumber Company before the final order."

On February 7, 1905, the receivers presented another petition as follows:

"That the amount due Geo. F. White, United States marshal, for taking care and preserving the property * * * amounted to over eleven hundred dollars, instead of six hundred dollars, as recited in petition presented January 5, 1905; also, that it was necessary during January, 1905, to invest in logs for said mills by purchase and by stocking same from their own lands the sum of two thousand and forty-eight and 93/100 dollars, instead of five or six hundred dollars as recited in former petition; also, that while as receivers they are shipping lumber and veneers far in excess of daily expense, yet it will be thirty days at least before the returns from said shipments will be received in amounts sufficient to keep up and pay the daily expenses of said property; * * * that at the present time there are offered to sale to them poplar, cypress, and pine logs upon which the profits will range from five to ten dollars per thousand feet, which they are unable to purchase for want of sufficient funds until they get returns from shipments already made and being made; * * * that a pay roll of about one thousand dollars will be due February 10, and, while they have a much larger amount due them from sales and shipments of lumber and veneers, yet they will be unable to collect same before said pay day, and your petitioners pray that they shall have authority to issue obligations for the purpose of carrying on this business and secure the money upon the same to an additional amount not to exceed two thousand dollars."

Upon consideration of this petition, with the proper showing of proof, the court passed the following order:

The receivers "are hereby authorized to issue and negotiate receivers' certificates in an amount not to exceed $2,000, which shall be a lien upon the property of the Erie Lumber Company and upon the products of the mills of the said company, and to be paid off and discharged as expenses of administration of the estate of the Erie Lumber Company in the hands of the receivers."

It will be observed from the record that the receivers were sedulous to impress the court with the belief that the Erie Lumber Company was now under all the circumstances in a state of singular prosperity. To this end on February 1, 1905, they had filed a report. This reported in their hands as valuable assets, real estate, improvements, and machinery amounting to $51,245.12, and other available assets received amounting to $4,932.32. This aggregated $56,177.44. Five days later they filed another report, stating the total liabilities as $7,647.98, with total work-

ing assets of the same amount. They made to the court the further statement:

"Estimated profit will be $100 per day or $2,400 (for the month). * * * Unless we are burned out, we can after pay day February 10, meet every expense and pay all receivers' certificates as they mature. We have contracts for our output at good prices for at least two months ahead. Logs are offered far beyond our ability to buy."

At the very moment of these roseate and deluding statements of these officers, who, as before stated, were agreed upon as receivers by the parties to the litigation, they were not only, in violation of the explicit order of the court, conducting a losing and ruinous business, but they had entered into contracts largely in excess of the explicit and carefully restricted authority which appears in the decree appointing them. These facts were after a time brought to the attention of the court by the counsel at whose instance they were appointed. Tinthoff and Short were at once removed, and E. P. Willingham was designated and appointed by the court to take over the assets and wind up the business. On March 28; 1905, Mr. Willingham filed his report of the condition of the properties. From this it appeared that under Tinthoff and Short the assets had dwindled from $56,177.44 to $22,207.51, including all accounts due the estate; that there was "owing by the receivers previously appointed by the court, in addition to the $5,000 of receivers' certificates, about $6,700, which said last-mentioned indebtedness" was due and represented "the purchase price due by the receivers for logs, groceries, and other supplies, together with the labor which was necessary for the operation" of the mills; that the receivers had continued to operate the mills, in violation of the court's order, "at a loss of several hundred dollars a month; and that there was no money on hand for the payment of this indebtedness," the substituted receiver having found only $5.94 in the bank to the credit of the bankrupt or of the two receivers. In the light of these facts, the receiver after running the mills several days closed them down, having determined that with their now inadequate equipment large loss would result to all parties interested, from their further operation.

The case now proceeded regularly in bankruptcy. A trustee was appointed. The assets were finally sold for the sum of $12,805.20, and after the deduction of certain minor expenses there now remains approximately $12,500 for distribution among the different classes of creditors. The contest before the court relates to this distribution. The controversy involving the priority of these claims was referred to the honorable referee in bankruptcy as special master. His report has been filed, and exceptions thereto have been also filed.

The claims may be generally classified as follows: (1) Claims by laboring men for wages for services rendered within three months before bankruptcy, and similar claims for services rendered while the receivership was of force; (2) the claims of the attorneys in the bankruptcy proceedings; (3) the claim of a mortgage creditor without notice of the bankruptcy proceedings; (4) the claim of a mortgage creditor with notice of such proceedings, who accepted benefits thereunder; (5) the holder of receivers' certificates, issued conformably to the orders of the court, for operating expenses; (6) claims for operating expenses

incurred within the terms of the decree authorizing the receivers to carry on the business; (7) general claims for property sold and goods furnished the receivers, not within the terms of such order, and not within the authority of the receivers.

The protection of the wages of labor is a primary duty of society and of government. The wage-earner constitutes an immense proportion of those who labor for the common welfare. So long as he remains helpful and self-sustaining, every prosperous result follows. In those unhappy epochs when the individual laborer is helpless, he and those dependent upon him become a charge upon the public. When labor en masse becomes helpless, when it is no longer possible to earn the means of subsistence, government itself is threatened, and revolution has often followed. It is therefore profoundly and philosophically true that it is the duty of government in every contingency to secure his earnings to the wage-earner. This truth is at the basis of those laws which attempt to accomplish the result upon which the existence of orderly society may itself depend. National and state legislation sedulously attempt to accomplish this, and otherwise to ameliorate the condition of the laboring man. The courts with equal solicitude strive to attain the same end. In his admirable work on Bankruptcy, Mr. Brandenburg declares:

"It may be generally stated that labor claims are entitled to priority and payment in full before the discharge of liens against the estate."

And again:

"Where under a state law a lien for wages is given priority over all claims excepting taxes and costs of administration, and the lien has attached before the fund is turned over to the bankruptcy court, and it is not such an one as is avoided by the bankruptcy act, it will be respected." Brandenburg on Bankr. 663, 665; In re Laird, 109 Fed. 550, 48 C. C. A. 538, 6 Am. Bankr. Rep. 14; In re Tebo (D. C.) 101 Fed. 419, 4 Am. Bankr. Rep. 235; In re Byrne (D. C.) 97 Fed. 762.

On this subject the law of Georgia is in no sense uncertain. Sections 2792 and 2794 of the Civil Code of Georgia 1895 provide:

"Laborers shall have a general lien upon the property of their employers, liable to levy and sale, for their labor, which is hereby declared to be superior to all other liens, except liens for taxes, the special liens of landlords on yearly crops, and such other liens as are declared by law to be superior to them."

"Liens of laborers shall arise upon the completion of their contract of labor, but shall not exist against bona fide purchasers without notice, until the same are reduced to execution and levied by an officer, and such liens in conflict with each other shall rank according to date, dating each from the completion of the contract of labor."

It is not deemed, however, that the last paragraph quoted is material in view of the issue here involved. Every mortgagee or lienor knew of the general character of the enterprise known as the Erie Lumber Company, and an indispensable element of its success each and all knew to be labor. Each and all knew when they took their mortgages how carefully the state and the nation as well would guard the rights of those who toiled with their hands to make such securities valuable. As to the laborers, it follows that no mortgagor can esteem himself or be regarded as a bona fide purchaser without notice.

But reliance need not be had merely upon reasoning of this sort. The Supreme Court of the state in Allred v. Haile, 84 Ga. 570, 10 S. E. 1095, has held that the general lien of a laborer is "higher than the lien of ordinary mortgages without respect to their comparative dates"; and in Langston v. Anderson, 69 Ga. 65, that such liens take precedence of mortgages, though the holders thereof may be bona fide and without notice. If, however, the state law were silent or even adverse upon the subject, the uniform system of bankruptcy adopted by Congress would in cases of this character protect the lien of the laborer. Said Collier on Bankruptcy, p. 504 (5th Ed.):

"The bankrupt act not only controls the state law in case of absolute conflict, but by its express regulation of these priorities excludes the state law altogether. Subject to these exceptions, if the state law gives the priority, the same·must be recognized in the bankruptcy proceedings"—citing In re Lewis, 4 Am. Bankr. Rep. 53, 99 Fed. 935; In the Matter of Slomka, 122 Fed. 630, 58 C. C. A. 322.

The explicit terms of the bankruptcy law indicate the settled purpose of Congress. Section 64 of the act (Bankr. Act July 1, 1898, c. 541, 30 Stat. 563 [U. S. Comp. St. 1901, p. 3447] provides for the priority of "wages due to workmen, clerks, and servants, which have been earned three months before the date of commencement of proceedings." Happily, however, the wise and politic benevolence of state legislation and state judicial administration avoid any such conflict. In Stonewall, etc., Ass'n v. McGruder, 43 Ga. 9, it is declared:

The law "is intended to give to these dependent people a preference to ordinary debts. And this, as we think, is also a wise public policy. These claims are generally small. They belong, for the most part, to persons who look solely to their daily wages for immediate subsistance, and, if they lose that,· they are in want, and in danger of becoming a public charge. * * * The laborer very properly, in our judgment, is thought by the Legislature to have the highest claim upon the assets of an insolvent debtor."

If, however, there were an entire absence of state legislation upon this subject, the general powers of a court of equity granted by the bankruptcy act would in our judgment protect claims of this class in the administration of the affairs of every insolvent corporation. It is the primary duty of the chancellor to provide for the wages of labor. Rowena Clarke v. Central R. R. (C. C.) 50 Fed. 338, 15 L. R. A. 683. The same power may be exercised here. The claims of these poor laborers, who are scattered in sparsely settled pine lands of the state, who are without representation of counsel, and without ability to secure such representation, but whose labor has created in large part the very values for distribution, nevertheless make strong and cogent appeal to the court for protection. Under the law, then, and under the inherent principles of equity, they are entitled to priority of payment out of the entire fund. These conclusions are intended to apply as well to the laborers whose services were rendered the Erie Lumber Company within three months before bankruptcy, and those who served the receivers appointed by order of the court. Under the bankruptcy law of the United States every laborer who actually labors under the authority of the court for the preservation or enhancement of the fund or property in custodia legis is entitled as to that estate to an equitable lien equivalent in effect to that of a bona fide purchaser without notice. To ex-

press it otherwise, a laborer, who by order of the court is employed on property in the hands of the court, as to the existent values in hand, will be paid by the court for the value of his services rendered to that property to which the liens of the creditors attach, and for the benefit of which his services were rendered.

There is little more difficulty with regard to the claims of the attorneys. These have been ascertained and after consideration of much evidence placed upon an equitable basis by the report of a special master. By the provisions of the bankruptcy law, in cases of involuntary bankruptcy, the attorneys are entitled to the payment of a fee as a matter of right. The amount, however, is discretionary with the court. These claims have been allowed by virtue of section 64 of the act as part of the costs of administration. In re Burke, 6 Am. Bankr. Rep. 502; Collier on Bankr. 471. It has, however, been argued that this section is applicable only after the assets have been marshaled and the liens discharged, and it does not affect liens, which come within other provisions of the statute. The better opinion, in our judgment, is that stated in Brandenburg on Bankruptcy, p. 639, that the right of attorneys for fees in bringing the property into court, in protecting it, in providing for the distribution of the values in accordance with the act, relates to the entire fund which may come under the control of the court. It is true then that the professional services of attorneys are essential to the proper administration of a bankrupt's estate, and are second only in dignity to the wages of labor exerted in its creation. In re Tebo; In re Byrne, supra; In re Duncan, 2 Am. Bankr. Rep. 321; Brandenburg, §§ 1009, 1010. It is also true that in the case of Liddon & Bro. v. Smith, 14 Am. Bankr. Rep. 204, 135 Fed. 43, 67 C. C. A. 517, the Circuit Court of Appeals of the Fifth Circuit held that the claim of an attorney for services nominally rendered does not have priority, but in that case the evidence seemed to indicate that the services had no legitimate connection with the preservation of the estate.

Besides, the recent amendment by the act of February 5, 1903 of section 40, par. "a" (chapter 487, § 9, 32 Stat. 799 [U. S. Comp. St. Supp. 1905, p. 687]), seems to strengthen the claim of attorneys upon all the funds in the hands of the court. The provision relates directly to the compensation of referees and trustees. The commissions are no longer paid on dividends, but these officers receive "one per cent. commission on all moneys disbursed to creditors by the trustee." Again, the amendment to section 48, par. A (32 Stat. 799 [U. S. Comp. St. Supp. 1905, p. 688]), accords to trustees commissions on all claims whether secured or entitled to priority under the laws of a state. It is true that before the enactment of these amendments it was held in Re Utt, 105 Fed. 758, 45 C. C. A. 32, that a mortgage lien is not taxable for costs in a bankruptcy proceeding, and that under sections 40 and 48 referees are not entitled to commissions paid to mortgagees from the proceeds of the mortgaged property, but the court in discussing the priorities observed:

"If the commissions allowed to the trustee and the referee are warranted by the law, the allowances to attorneys and others are probably equally justifiable."

If this conclusion is sound, it follows that since these commissions to the trustee and referee are now under the amendments warranted by law as against the whole fund by a parity of reasoning, the rights of the attorneys will be regarded as equally comprehensive. We are of the opinion, therefore, that doubts expressed in the earlier decisions as to the priority over the claims of lienholders of attorney's fees as a part of the costs of administration and holders of priorities created by the state laws should be removed by these amendments. Nor is this conclusion in itself unreasonable. This court in Re Alison Lumber Co., 14 Am. Bankr. Rep. 84, 137 Fed. 643, used the following language:

"The expenses and costs of the bankruptcy court stand upon a superior footing; and, if there is not sufficient money arising from the sale of unpledged property to pay them, it seems that the secured creditors should contribute ratably to that purpose. They have appeared in the bankruptcy court, selected it as their forum, availed themselves of the services of its officers, and utilized its process to collect their claims. We have no doubt of their duty to contribute to pay all such costs and expenses."

This reasoning was adopted in Re Burke, 6 Am. Bankr. Rep. 502, where it is declared that "legal services are often quite as actual and necessary as are doors and locks and roofs." The attorneys are officers of the bankruptcy court—indispensable officers—and the fees allowed by the special master, just and reasonable as they are, in view of the large amount involved, the multiplicity of issues, the difficulty of the cause, and the skill and ability manifested, must be allowed as a part of the cost of administration, and second only to the wages of laborers.

Next in priority in the judgment of the court is the mortgage of Charles Schimmelfing. Under the views hereinbefore expressed, the fund which would otherwise be appropriated to discharge this mortgage in full should be made ratably to contribute to the wages of the laborers and to the fees of the attorneys. Its priority over all other liens is ascribable to the fact that the mortgagee had no actual notice of the bankruptcy proceeding. Section 58 of Bankr. Act July 1, 1898, c. 541, 30 Stat. 561 [U. S. Comp. St. 1901, p. 3444] provides for 10 days' notice by the referee to all creditors of the bankrupt, as to all examinations of the bankrupt, hearings, meetings of creditors, and proposed sales of property. The master finds that this mortgagee had notice of none of these proceedings nor of the trustee's application to sell, and that he never became party thereto until after the sale, when he filed an intervention asking the payment and discharge of the amount of his lien from the proceeds, without deduction of other costs than the reasonable expenses of the sale. Subject to the superior liens hereinbefore determined the master's finding is approved.

We next consider the claims of the holder of receivers' certificates and certain claims incurred in the operation of the property by the receivers. It is essential to bear in mind the manner in which these receivers were appointed. All of the parties to the litigation entered into a written agreement that it would be advantageous for all concerned if the corporation could be continued as a going concern. It was made to appear by the agreement and otherwise that this course was absolutely essential for the preservation of the property; that, if the business should be continued, the company would probably pay out in full, and

great loss would certainly ensue if the mills and business should remain idle during the pendency of the bankruptcy proceeding. The prospective venture was made to appear most hopeful, and since, in case of mill property of this character, its value so largely depends on the performance of its executory contracts, the increase, and sale of the manufactured product, in the interest of all the creditors, the court made the order sought. The receivers were required to give adequate bond, to file frequent reports "of all receipts and disbursements, and as accurately as may be, the profit or loss in the operation of said mills"; and, so that additional loss might be averted, the order was explicitly made that, should the operation of the plant not prove advantageous, the receivers should "report the fact to the court, to the end that proper steps may be taken to discontinue the operation of said business." Pursuant to the terms of their original order of appointment, and subsequent applications all apparently meritorious, the receivers presented with unanimity, and supported by proof, their applications, and the court at various times authorized the issue of receivers' certificates on January 5, 1905, in the amount of $3,000, and on February 7th, of the same year, $2,000, to pay laborers and other necessary running expenses. At this time, as previously stated, the report of the receivers showed an aggregate of assets of $56,177.44, and estimated profits for the continuance of the business of $2,400 a month. The reports were regularly filed with the record. No exception was made to these reports by any of the parties, and the court had every reason to believe that they were true. There was no intimation that the business was being conducted at a loss. The court was misled into the belief that the operation was proving highly beneficial to the estate. The misconduct of the receivers having been finally reported to the court by the law firm at whose instance they were appointed, another receiver was appointed in their stead. Not only did it then appear that there had been a vast, and indeed, unexplained, loss in the value of the assets, but that the receivers had incurred an indebtedness of $6,700 in addition to the $5,000 of receivers' certificates which had been authorized. Now, section 2, par. 5, of Bankr. Act July 1, 1898, c. 541, 30 Stat. 546 [U. S. Comp. St. 1901, p. 3421], and its amendments expressly vest courts of bankruptcy with the power to "authorize the business of bankrupts to be conducted for limited periods by receivers, the marshals, or trustees, if necessary in the best interest of the estates." There was, therefore, no doubt of the power of the court to take the action it did. Authorized to operate the property through its receivers, it was equally competent for the court to raise on the credit of the values in hand the funds immediately necessary for its operation. Here was a large sawmill plant, with planing mill, veneering mill, large orders for its products, all belonging to a class of business which at the time and since then has been most notably prosperous. These considerations, with the agreement of the parties, and the necessity of preserving the assets, seemed to make it imperatively necessary to continue the operation in the best interests of the estate. The power to issue such certificates can no longer be doubted. In Wallace v. Loomis, 97 U. S. 146, 24 L. Ed. 895, Mr. Justice Bradley for the court declared:

"The power of a court of equity to appoint managing receivers of such property as a railroad, when taken under its charge as a trust fund for the payment of incumbrances, and to authorize such receivers to raise money necessary for the preservation and management of the property, and make the same chargeable as a lien thereon for its repayment, cannot, at this day, be seriously disputed. It is a part of the jurisdiction always exercised by the court by which it is its duty to protect and preserve the trust funds in its hands."

See, also, Miltenberger v. Logansport Ry. Co., 106 U. S. 286, 1 Sup. Ct. 140, 27 L. Ed. 117; Union Trust Co. v. Illinois Midland Co., 117 U. S. 435, 6 Sup. Ct. 809, 29 L. Ed. 963. In the latter case Mr. Justice Blatchford said:

"Its power to do this does not depend on consent, nor on prior notice. Consent is desirable, but is seldom practicable, where the debts exceed the value of the property. Though prior notice to persons interested, by notifying them as parties, first requiring them to be made parties if they are not, is generally the better way, yet many circumstances may be judicially equivalent to prior notice. A full opportunity, as in this case, to be heard, on evidence, as to the priority of the expenditures and of making them a first lien, is judicially equivalent."

It is, however, urged that the court may provide for the priority of receivers' certificates only in case of a railway or quasi public corporation. In view of the act of bankruptcy authorizing the continuance of a private corporation through a receiver, we do not think that this is true. The power to continue business implies the power to make debts, and to provide for their payment, which must include the power to borrow money for urgent necessities and for direct operating expenditures. These considerations, we think, are conclusive as to the validity of the receivers' certificates, nor has any other lienholder the right to complain of their priority. As stated in Union Trust Co. v. Illinois Midland Co., supra:

"The court always retains control of the matter, its records are accessible to lenders and subsequent holders, and the certificates are not negotiable instruments."

The issuance and existence of the certificates, as well as the terms of the order appointing the receivers, were matters of record, and were notice to all creditors and to all persons having dealings with the receivers. We conclude, therefore, that these certificates stand next in order of priority to the mortgage of Schimmelfing. Their holders are, however, equally liable to contribute ratably to the wages of laborers and the fees of attorneys.

On the same footing with the receivers' certificates, stand all the claims for logs sold to the receivers under the order of the court. In one of these claims the title had been vested in the Citizens' Bank of McRae under a bill of sale given as security by the Erie Lumber Company before any of the proceedings in bankruptcy. The logs were sold to the receivers pursuant to the order of the court authorizing the latter to buy lumber and other things necessary for carrying on the business. This claim, and similar ones, represent, therefore, part of the authorized operating expenses, and are to be paid subject to their ratable contribution to wages and attorney's fees, together with the receivers' certificates.

The mortgage of the Citizens' Bank of McRae must be distinguished from that of Charles Schimmelfing, which has previously been considered, for the reason that the bank not only had notice of all the proceedings in bankruptcy, but actually participated in the transactions of the receivership. The master reports that they made no objection to any of the orders of the presiding judge, or to those of the referee. Now, it is clear that the right of a creditor to priority of payment may be waived by some act inconsistent with the continuance of such right. Brandenburg on Bankr. 669, citing Claflin v. Eason, 2 Am. Bankr. Rep. 263. A proceeding in bankruptcy is a proceeding in rem. The filing of the petition is a caveat to the whole world, and in effect an attachment and injunction. Mueller v. Nugent, 184 U. S. 14, 22 Sup. Ct. 269, 46 L. Ed. 405. Besides, these mills are located in the same county as this bank, and it was made a depository for the receivers. It took two notes from the receivers, and sold to them certain logs and lumber located at the mill, in conformity with the provisions of the order of appointment. The bank officers had actual, as well as constructive, notice that the Erie Lumber Company was being carried on by the receivers as a going concern. This, in our judgment, will preclude them from insisting upon the priority of their mortgage over the operating expenses or other obligations incurred for carrying on the business, which was intended to conserve their security. It is declared in Gluck and Becker on Receivers (section 97):

"Though a mortgagee has not had notice of the application, he cannot stand by and see the court and the receiver create indebtedness and prior liens upon the property, and content himself with merely protesting generally and disclaiming all interest under the receivership. He must act promptly, and in good faith intervene and present his objection to the court in season, or he cannot afterward be heard. The court will not visit upon innocent parties, dealing with a receiver within the authority of its orders, consequences which result from inequitable negligence and supineness of a party to the suit, or of those represented by him."

A fortiori is this principle applicable where the mortgagee so far approves the receivership as to seek and secure benefits thereunder. It is evident to all familiar with the record that, had the receivership been properly conducted, the plant would have worked out its indebtedness, and the hopeful purpose of the creditors would have been effected. No one was more interested in this result than the Citizens' Bank of McRae. Because, however, by reason of the misconduct or incapacity of the receivers chosen by the parties themselves, there was a failure of the project, innocent parties who within the restrictions of the court's orders trusted the receivers will not be made to suffer for the benefit of a mortgagee, who took all the chances and who comes into the bankruptcy court at the eleventh hour and asks the exclusion for its benefit of the claims of those who in good faith co-operated with the court and the other creditors to save the property. The lien of the Citizens' Bank of McRae is valid and effective, but is subordinate to wages, to attorney's fees, to the Schimmelfing mortgage, to the receivers' certificates, and to its own and other claims for logs sold to the receivers.

An attempt is made by one M. L. McCullough to establish a claim of his against the receivers. He alleges that he has sustained certain

damages by reason of the failure of the two receivers properly to carry out a contract with him. His claim is not liquidated by verdict or judgment. It is merely a claim for the difference between the contract price and the market price. If the receivers were guilty of any breach of contract with him, none of the creditors having interest in the fund are responsible for it. The receivers are each sui juris and personally responsible for any wrong ex contractu or ex delicto which they may have committed. The claim is unliquidated, and, even if liquidated, would as against antecedent liens have little or no superior dignity to a claim of a general creditor.

We now approach the consideration of a class of claims which has given the court unfeigned concern. These are the claims of merchants and others who furnished goods to the receivers for an amount in excess of the indebtedness which the receivers were authorized to contract. A casual scrutiny of the order appointing the receivers will disclose the purpose of the court that they should be allowed to borrow money and conduct a cash business. They had no authority whatever to buy goods on credit. In its original order the court used this language:

"It is ordered that, for the purpose of starting the operation of said mills and the defraying of necessary expenses until such time as moneys shall be coming in from the operation of the business sufficient to defray expenses of operation, and the said receivers shall have authority to borrow money and incur obligations to an amount, however, not to exceed in the aggregate $3,000."

Upon this clause an argument is sought to be based which would justify merchants and others dealing with the receivers to trust them in any amount whatever. This is obviously an improper and unfair interpretation of the language used. It is perhaps justifiable to conclude that amounts due on contracts made by the receivers, for the purpose of starting the operation and defraying necessary expenses, anterior to the order which authorized the receivers' certificates for $3,000, should be regarded as a valid part of the operating expenses. The date of those receivers' certificates, however, is fixed by the order authorizing them, which was a separate and independent order. All of the orders of the court relating to this subject must be regarded as notice to all persons dealing with the receivers. It was the duty of merchants and others so dealing to look to the extent of the authority of the receivers. Since it is clear from the record that they had no authority whatever to incur a general indebtedness subsequent to the order authorizing receivers' certificates for the $3,000, it is unhappily not in the power of the court to pay for goods or supplies furnished the receivers subsequent to that date, to wit, the 5th day of January, 1905. Claims of this character before that date may be treated as operating expenses.

These merchants, however, are not wholly without remedy. The bonds of the receivers, each in the amount of $7,500, are on file. They are conditioned for the faithful performance by the receivers of their duty; and those who have losses because these officers of the court have disregarded its orders and contracted debts in excess of the authority granted them may bring actions on these bonds to redress the wrongs. But this is not all. It is ever the duty of the court to prevent, if it can, and, if not preventable, to redress so far as the laws permit, in-

juries inflicted upon others by its officers. This is especially true if the injury is inflicted in violation of distinct and carefully guarded orders of the court. The record had under review seems to disclose such injury and such violation of the decrees and orders of the court as would justify an inquiry in another proceeding into the conduct of these officers.

Order will be taken, therefore, that the trustee shall take counsel and inquire whether these receivers, or either of them, are probably guilty oi contempt of court, and, if advised that such course is proper, application shall then be made for the attachment of one or both of said receivers, that they may be brought before the court to show cause, if any they can, why they should not be punished for misconduct and disobedience of its orders.