### In re HOWARD.

(District Court, N. D. New York. August 8, 1913.)

1. INTEREST (§ 43*)—STIPULATIONS—CONSTRUCTION.

The condition of a bond secured by a mortgage provided for the payment of $1,200 without mentioning interest, of which $15 was to be due on the first day of each month, and further provided that such payment of $15 was to be for interest and principal; that at the end of each year the mortgagor was to be credited for the sums actually paid, interest and principal; that should any default be made in the payment of interest, etc., the principal sum should become due. The mortgage provided that for better securing the payment of the sum mentioned in the condition of the bond, "with interest thereon," the premises described were thereby granted, and further provided that, if the mortgagor should pay the sum mentioned in the condition of the bond "and the interest thereon," the mortgage and the estate granted should cease, determine, and be void. *Held*, that the whole principal sum bore interest from the date of the instruments which the obligors promised to pay from month to month, with the monthly payments of principal; the bond and mortgage not being open to the construction contended for that interest was to be allowed on each installment for one month only, and to be deducted from the $15 before applying the balance on the principal, since interest was plainly and repeatedly provided for and was in no way limited to interest on the installments, especially where, at the time of an assignment of the bond and mortgage, the mortgagor indorsed on the bond a stipulation as to the amount due, showing that he construed the bond as providing for interest on the whole principal sum.

[Ed. Note.—For other cases, see Interest, Cent. Dig. § 92; Dec. Dig. § 43.*]

2. INTEREST (§ 1*)—GROUNDS FOR ALLOWANCE.

Interest can be allowed only by virtue of some contract, express or implied, or by virtue of some statute, or on account of the default of the party liable to pay, when it is allowed as damages for the default.

[Ed. Note.—For other cases, see Interest, Cent. Dig. § 1; Dec. Dig. § 1.*]

3. MORTGAGES (§ 106*)—CONSTRUCTION BY PARTIES.

The construction placed upon a bond and mortgage by the parties thereto had force so far as there was any ambiguity.

[Ed. Note.—For other cases, see Mortgages, Dec. Dig. § 106.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. BANKRUPTCY (§ 188*)—LIEN ON PROPERTY—STIPULATIONS AS TO AMOUNT DUE—EFFECT.

A stipulation by a mortgagor who subsequently became bankrupt, indorsed on a bond at the time of an assignment of the bond and mortgage as to the amount then due, which, through an error in computation, stated a larger amount than that actually due, did not increase the lien of the mortgage as against the trustee in bankruptcy and other creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 270, 286–289, 291–295; Dec. Dig. § 188.*]

5. MORTGAGES (§ 199*)—RENTS AND PROFITS—APPLICATION.

While a mortgagee who takes possession of the mortgaged property without agreement must apply the rents and profits derived therefrom entirely in reduction of the bond and mortgage, the mortgagor and mortgagee by agreement may, as against other creditors, provide for their application in part on an unsecured indebtedness due the mortgagee.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 513–525; Dec. Dig. § 199.*]

6. BANKRUPTCY (§ 186*)—POSSESSION OF PROPERTY—RIGHTS OF MORTGAGEE.

A mortgagee in possession of the mortgaged property when the mortgagor was adjudicated a bankrupt was entitled to retain such possession as against the trustee in bankruptcy and general creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 285, 319; Dec. Dig. § 186.*]

7. BANKRUPTCY (§ 267*)—SALE OF MORTGAGED PROPERTY—COSTS.

In a bankruptcy proceeding a mortgagee of real estate, which was the the only property owned by the bankrupt, claimed that more was due and unpaid on the mortgage than in fact was, while the trustee claimed that much less was due and unpaid than in fact was due, and also delayed a sale for about a year after being authorized to make one, allowing the interest to accumulate. A sale was made free from liens and incumbrances, which the referee declined to confirm, and a resale was ordered. On the resale the mortgagee and certain judgment creditors interfered with the sale, claiming that the orders of the court were improper and that whoever purchased would be compelled to pay the liens in addition. A motion was made to punish them for contempt, and the court ordered a resale, enjoining further interference. The property was sold for more than the amounts of the mortgages and judgment, thus showing that the trustee was justified in claiming that there was some equity in the property, but for less than was necessary to pay such liens, the expenses of the sales, and the expense of administering the bankrupt's estate. *Held* that, in view of the fact that both the trustee and the lienors had been more or less in the wrong, there would be allowed out of the proceeds of the sale the necessary expenses of the various sales but not the expenses of administration in the bankruptcy court.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 371, 380; Dec. Dig. § 267.*]

8. BANKRUPTCY (§ 267*)—SALE OF MORTGAGED PROPERTY—COSTS.

In a bankruptcy proceeding the mortgagee and trustee stipulated that the mortgaged property might be sold by the trustee in bankruptcy free and clear of all incumbrances; the lien to attach to those proceeds, except that it should not attach to $30 of the proceeds, which it was thereby stipulated should be allowed as the expenses of the trustee in making a sale of the property and advertising it. On a sale of the property the mortgagee, however, interfered therewith, claiming to those present and to would-be purchasers that the order of the court for a sale free and clear of the mortgage was improper and ineffectual, and that whoever purchased the property would be compelled to pay the liens, in addition to the purchase price, thus making a resale of the property neces-

*For other cases see same topic & § NUMBER in Dec. & Am Digs. 1907 to date, & Rep'r Indexes

sary. *Held* that, in view of the mortgagee's unwarranted interference with the sale, the expense of selling the property, allowable out of the proceeds, was not limited to the amount stipulated.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 371, 380; Dec. Dig. § 267.*]

**9. BANKRUPTCY (§ 267*)—SALE OF MORTGAGED PROPERTY—COSTS.**

The bankruptcy court cannot order mortgaged premises sold free and clear of the lien of the mortgage and use the proceeds of the sale properly applicable to the payment of the mortgage in paying the general expenses of administering the estate in bankruptcy, but may order and make such sale free and clear of the mortgage, bring the proceeds into court, ascertain the amount actually due and owing on the bond and mortgage, and make proper allowances for the necessary expenses of so doing.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 371, 380; Dec. Dig. § 267.*]

**10. BANKRUPTCY (§ 368*)—TRUSTEE'S COMMISSIONS—PROCEEDS OF MORTGAGED PROPERTY.**

Under Bankr. Act July 1, 1898, c. 541, § 48a, 30 Stat. 557 (U. S. Comp. St. 1901, p. 3439), as amended in 1903 (Act Feb. 5, 1903, c. 487, § 11, 32 Stat. 799 [U. S. Comp. St. Supp. 1911, p. 1501]), providing that trustees shall receive from the estates which they have administered such commissions on all moneys disbursed by them as may be allowed by the courts, not exceeding the sum specified, commissions are allowable on moneys received and disbursed by them which were derived from the sales of mortgaged property, and which were covered by and properly applicable to the payment of the lien, in view of the amendment of 1910 (Act June 25, 1910, c. 412, § 9, 36 Stat. 840 [U. S. Comp. St. Supp. 1911, p. 1501]) expressly providing that they shall receive such commissions on moneys disbursed to any person, including lienholders, as may be allowed, etc.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 571; Dec. Dig. § 368.*]

**11. BANKRUPTCY (§ 262*)—SALE OF MORTGAGED PROPERTY.**

Whether property of a bankrupt, subject to mortgages or judgment liens, shall be sold free from the liens is for the determination of the bankruptcy court and not the lienors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 363–365; Dec. Dig. § 262.*]

**12. BANKRUPTCY (§ 474*)—SALE OF MORTGAGED PROPERTY—COSTS.**

Where a lien asserted by a mortgagee in a bankruptcy proceeding is largely in excess of the true amount due and unpaid, or there is reasonable ground to so believe, the trustee may contest the claim and, if successful, the court may charge some portion or all of the expense, including an attorney's allowance in ascertaining the amount due, against the fund that would otherwise go to the lienors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 878–884; Dec. Dig. § 474.*]

In Bankruptcy. In the matter of bankruptcy proceedings of Daniel B. Howard, bankrupt. Application to determine claims to the proceeds of a sale of mortgaged real estate belonging to the bankrupt. Fund awarded to the owner of the mortgages, less certain payments connected with the sale.

This litigation involves the construction of the language of two bonds and mortgages as to the payment of interest and consequently the amount due thereon. And, second, the expenses, etc., properly al-

lowable to the trustee and his attorney from the proceeds of the sale of the mortgaged real estate; same having been sold free and clear of all incumbrances and there being substantially no estate except such proceeds.

Vere H. Multer, of Binghamton, N. Y., for trustee.

W. H. Johnson, of Oneonta, N. Y., for George A. Howard, owner of mortgages.

RAY, District Judge. [1] On the 6th day of July, 1895, one D. B. Howard and Altheda R. Howard, his wife, executed and delivered to one Alfred C. Lewis, his executors or assigns, their joint and several bond in the penal sum of $2,400, and which states:

"The condition of this obligation is such, that if the above-bounden D. B. Howard and Altheda, his wife, their heirs, executors, administrators, shall and do well and truly pay or cause to be paid unto the above-named Alfred C. Lewis, his certain attorney, executors, administrators or assigns, the sum of twelve hundred dollars in the manner following, viz., the sum of fifteen dollars is to be due and payable on the first day of each and every month hereafter until the full sum of principal is paid. The party of the first part is to have the privilege of paying any larger sum of principal on the first day of July or December of any year hereafter that he desires. The said payment of $15 is to be for interest and principal and at the end of each year first party is to be credited for the sums actually paid, interest and principal, payments hereon to be made at First National Bank of Oneonta, N. Y., without fraud or delay, then this obligation to be void, otherwise to remain in full force and virtue. And it is hereby expressly agreed, that should any default be made in the payment of the said interest, or any part thereof, on any day when the same is made payable as above expressed, and should the same remain unpaid and in arrears for the space of thirty days, then, and from thenceforth, that is to say, after the lapse of the said thirty days, the aforesaid principal sum of twelve hundred dollars, with all arrearages of interest thereon, shall at the option of the obligee, his executors, administrators, or assigns, become and be due and payable immediately although the period above limited for the payment thereof may not then have expired, anything hereinbefore contained to the contrary thereof in any wise notwithstanding."

The payment of the money agreed to be paid by this bond was secured by a mortgage on real estate, the proceeds of the sale of which are now in court, which contained the same condition as to payment as the bond down to and including the words "payments hereon to be made at First National Bank of Oneonta, N. Y.," and the mortgage then contains this provision:

"Now this indenture witnesseth, that the said party of the first part for the better securing the payment of the said sum of money mentioned in the condition of the said bond or obligation, *with interest thereon*, and also for and in consideration of one dollar paid by the party of the second part, the receipt whereof is hereby acknowledged, does hereby grant and release," etc.

Then follows a description of the real estate mortgaged. Then follows an insurance clause, and then the following:

"Provided always, that if the said party of the first part, his heirs, executors or administrators, shall pay unto the said party of the second part, his executors, administrators or assigns the said sum of money mentioned in the condition of the said bond or obligation, *and the interest thereon*, at the time and in the manner mentioned in the said condition, that then these presents,

and the estate hereby granted, shall cease, determine and be void. And the said D. B. Howard covenants with the party of the second part as follows: That the party of the first part will pay the indebtedness as hereinbefore provided," etc.

This mortgage is not signed by the wife.

July 7, 1895, Lewis assigned this bond and mortgage to Marshall Mitchell, who November 21, 1907, assigned them to George A. Howard.

On the 6th day of April, 1896, the said D. B. Howard and Altheda R. Howard executed, acknowledged, and delivered to said A. C. Lewis another bond which states that they are justly indebted to said Lewis in the sum of $1,050, which they bind themselves to pay, and then follows this condition:

"The condition of this obligation is such that if the above-bounden D. B. Howard and Altheda R. Howard, their heirs, executors, administrators, shall and do well and truly pay, or cause to be paid unto the above-named A. C. Lewis, his certain attorney, executors, administrators or assigns, the sum of five hundred and twenty-five dollars, in manner following, viz., the sum of fifteen dollars per month to be paid each and every month of the principal and interest, with privilege of first party paying any larger sum on any payment day, interest to be paid at the rate of 6% per annum. Said payments to be continued until the principal and interest is fully paid, said payments to begin April 1st, 1896, without fraud or delay, then the preceding obligation to be void, otherwise to remain in full force and virtue."

On the same day said Howard and wife executed, acknowledged, and delivered to said Lewis a mortgage on such real estate, which contains the following:

"Whereas, the said D. B. Howard, justly indebted to the said party of the second part in the sum of five hundred twenty-five dollars, lawful money of the United States, secured to be paid by their certain bond or obligation, bearing even date herewith, conditioned for the payment of the said sum of five hundred twenty-five dollars, in manner following, viz., the sum of fifteen dollars per month, to be paid each & every month of the principal and interest, with privilege of first party paying any larger sum on any payment day, interest to be paid at the rate of 6% per annum. Said payments to be continued until the principal & interest is fully paid hereon. Said payments to begin April 1, 1896. It being thereby expressly agreed, that the whole of the said principal sum shall become due after default in the payment of interest, as hereinafter provided. Now this indenture witnesseth, that the said party of the first part, for the better securing the payment of the said sum of money mentioned in the condition of the said bond or obligation, with interest thereon, and also for and in consideration of one dollar, paid by the said party of the second part, the receipt whereof is hereby acknowledged, do hereby grant and release unto the said party of the second part, and to his heirs and assigns forever."

Alfred C. Lewis died and Edson A. Hayward was appointed administrator with the will annexed of his estate, and May 17, 1900, he sold and assigned said bond and mortgage to B. W. Hoye, who on the 16th day of December, 1907, sold and assigned same to said George A. Howard. When Hoye assigned this bond and mortgage December 16, 1907, he covenanted in the assignment "that there is due and to become due on said bond and mortgage the sum of four hundred dollars ($400), with interest thereon from Dec. 6th, 1907." On the same day the following indorsement was made on the bond:

"Received on the within bond $19.96 interest and $55.38 principal, Dec. 16, 1911."

On the same day D. B. Howard, one of the principals in the bond, signed the following statement written on the bond:

"December 16th, 1907. It is hereby stipulated and agreed the amount due and unpaid on this bond and the mortgage accompanying the same is $400, four hundred dollars. D. B. Howard."

The indorsements on this bond, including the one mentioned, are as follows: April 14, 1898, $31.50; May 31, 1898, $10; June 21, 1899, $31; May 21, 1900, $16, "on account of interest"; December 22, 1900, $14.90, "bal. int. to April 1, 1900"; April 20, 1901, $30.90, "int. to April 6, 1901"; April 25, 1902, $10, "to apply on interest due April 6, 1902"; May 20, 1902, $10, "to apply on interest due April 6, 1902"; June 24, 1902, $10, "to apply on int. due April 1, 1902, bal. 90c"; July 24th, "recd. bal. of interest 90c to bal. of int. to April 6, 1902"; December 20, 1902, $10; January 23, 1903, $5; February 20, 1903, $5; March 20, 1903, $5; April 21, 1903, $5; May 25, 1903, $5; December 16, 1908, "$24 interest and $80 payment on principal"; August 12, 1910, $11.86 "interest to Aug. 14, 1910, and $41.20 to apply on principal"; December 16, 1910, $5.37 "int. and principal $10.64 from Aug. 12 to Dec. 16, 1910"; and December 16, 1911, the said sums of $14.96 interest and $55.38 principal.

July 6, 1895, in his assignment of the bond and mortgage of that date for $1,200, Lewis covenanted that there was due on said bond and mortgage the sum of $1,200. This was a purchase-money mortgage. The indorsements on this bond and mortgage of July 6, 1895 (the first one), are as follows: August 29, 1895, $15; October 31, 1895, $30; February 25, 1897, $12; April 2, 1897, $15; August 25, 1897, $72; August 23, 1898, $60; September 23, 1898, $12; September 2, 1899, $45; November 21, 1899, $27; July 24, 1901, $20; September 29, 1901, $40; October 23, 1901, $12; April 26, 1902, $10; May 21, 1902, $10; June 25, 1902, $10; July 24, 1902, $10; December 21, 1902, $10; January 22, 1903, $20; March 24, 1903, $15: May 29, 1903, $10; July 23, 1903, $15; November 19, 1903, $20; October 22, 1905, $30; December 14, 1905, $20; January 4, 1906, $50; February 5, 1907, $10; July 5, 1907, $20; August 7, 1907, $10; September 27, 1907, $10; November 21, 1908, "$87.06, one year's interest on within bond"; "Nov. 21, 1909, received $87.06, one year's interest on within"; August 12, 1910, $63.12, "interest from Nov. 21, 1909, to Aug. 12, 1910"; interest from August 12 to November 21, 1910, $23.94; "Nov. 21, 1911, received $87.06, one year's interest on within bond." When Lewis assigned this bond and mortgage to Marshall Mitchell, the following agreement was indorsed on the bond and signed by both D. B. Howard, one of the mortgagees, and by Mitchell viz.:

"It is agreed after a careful computation that the amount due and unpaid on the within bond, at this date, Nov. 21, 1907, is fourteen hundred fifty-one ($1,451.00) dollars. Marshall Mitchell.
"D. B. Howard."

When Mitchell assigned to George A. Howard, this agreement was on the bond and thereafter D. B. Howard paid interest on that basis

as the indorsements show. The premises mortgaged sold for the sum of $1,825 on the 2d day of July, 1912.

The trustee in bankruptcy contends, as to the bond and mortgage of July 6, 1895, for $1,200, that it is payable in monthly installments, and that if the payments of $15 had been made at the end of each month, as provided in the bond, the payment would be applicable to the liquidation of that installment of principal with the interest on such installment only and not to the payment of interest on the whole principal sum; the balance of the payment going or being applied to the reduction of the principal, leaving a new principal after each payment. This construction of the provisions of the bond and mortgage claimed would involve a computation at the end of each month to determine how much of the $15 was applicable to the payment of interest and how much to the installment of principal to be paid. That is, the contention of the trustee is that at the end of the first month the sum of $15 was to be paid and applied in part. as interest for one month on some part of the $15 to be ascertained by computation; the said part of such payment to be applied in reduction of the principal. Thus the question would be: What sum placed at interest at 6 per cent. will amount to $15 in one month and that sum would be the amount to be applied as payment on the principal, assuming the full $15 was paid when due? This contention is. not warranted by the language of the bond alone or of the bond and mortgage read together. It is plain, I think, that the whole principal sum draws interest from the date of the bond and that the monthly payments were intended to apply in payment of interest and the balance to the payment of principal, making a new principal each month in case the payments were kept up. It is true that the purpose is not as plainly expressed as it might have been. The condition is that the obligors will pay to Lewis or·his executors, etc., the sum of $1,200 (no mention of interest) in the manner following, viz.:

"The sum of $15 to be due and payable on the first day of each and every month hereafter until the full sum of principal is paid."

If the parties had stopped here, no interest would or could be allowed, but they did not and immediately continued and provided:

"The said payment of $15 is to be *for interest and principal*, and at the end of each year first party is to be credited for the sums actually paid *interest and principal*."

Then follows the usual interest clause. Then the mortgage itself says:

"The said party of the first part for the better securing the payment of the said sum of money mentioned in the condition of the said bond or obligation [evidently the $1,200], *with interest thereon* [evidently on the $1,200], hereby grant," etc.

Later it is provided that if the first party shall pay "the said sum (not sums) of money mentioned in the condition of the said bond or obligation [evidently the $1,200], *and the interest thereon* [not interest on the monthly installments], at the time and in the manner," etc., then the mortgage is to become and be void. There is no lan--

guage in either the bond or the mortgages confining interest to the installments or indicating a purpose to do so. It is expressly declared in the bond that "the said payment of $15 [monthly] is to be for *interest* and principal." Interest on what? Is it interest on the principal sum or on the installments merely? I think it very clear, reading both instruments together, that interest on the whole sum was intended and that the bond is to be so construed. There is nothing to indicate a contrary intention. The agreement to pay interest on the whole principal sum from the date of the bond, if not plainly expressed in words, is plainly implied.

[2] It is true that:

"Interest can be allowed only by virtue of some contract, express or implied, or by virtue of some statute, or on account of the default of a party liable to pay when it is allowed as damages for the default." Woerz v. Schumacher, 161 N. Y. 530, 56 N. E. 72, affirming 37 App. Div. 374, 56 N. Y. Supp. 8; Forschirm v. Mechanics' & Traders' Bank, 137 App. Div. 149, 122 N. Y. Supp. 168; Morley v. Lake Shore, etc., R. Co., 146 U. S. 162, 168, 13 Sup. Ct. 54, 36 L. Ed. 925.

Here the payment of interest is plainly and repeatedly provided for and in no way is it limited to interest on the installments. I think the fair and just inference and implication from the language used and the nature of the debt and promise are that the whole principal sum was to bear interest from the date of the instruments, and that the obligors in the bond promised to pay it from month to month with the monthly payments of principal. Redfield v. Bartels, 139 U. S. 694, 701, 11 Sup. Ct. 683, 35 L. Ed. 310; Redfield v. Ystalyfera Iron Co., 110 U. S. 174, 176, 3 Sup. Ct. 570, 28 L. Ed. 109.

"Where there are several agreements in writing, together constituting a single transaction, they should be construed together (here the bond and mortgage) to arrive at the true intent of the parties." Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843; Teal v. Walker, 111 U. S. 242, 4 Sup. Ct. 420, 28 L. Ed. 415; United States v. Bostwick, 94 U. S. 53, 65, 24 L. Ed. 65.

[3] It is evident from the indorsements and the agreement signed by D. B. Howard as to the computation and amount due on this mortgage that Howard construed the bond as providing for interest on the whole principal sum. True the parties could not make a new contract in that way or change the one existing, but their acts show how Howard, the obligor, understood it, and this has force so far as there is any ambiguity. From the words "and at the end of each year first party is to be credited for the sums actually paid interest and principal," it may be inferred that there was to be an application of the payments at the end of the year only (that is, interest computed for the year and added and the payments deducted), but such construction would work to the disadvantage of the obligors, as they would lose the benefit of interest on the partial payments made during the year.

[4] It is now conceded that, when Mitchell took the assignment of this $1,200 mortgage, an error in computation was made and that the amount then due and unpaid was $1,435.09 and not $1,451 as stipulated. This brings up the question whether or not the trustee

in bankruptcy is estopped from asserting and showing this error, as he represents the creditors of D. B. Howard who signed the stipulation at the time it was assigned to Mitchell. It possibly may be that, if Geo. A. Howard relied on that agreement and paid his money, D. B. Howard in a litigation between himself and Geo. A. Howard would be estopped to deny that the sum of $1,451 was then due and unpaid. There is no claim that any fraud was practiced or fraudulent representations made as to the amount due or due and to become due when Mitchell took the assignment or when Mitchell assigned to Geo. A. Howard. The indorsements were on the bond and the errors in computation did not increase the lien. The question here is the amount of the lien of Geo. A. Howard on the fund in court, and I hold that it must be determined, by computing under the rules applicable to partial payments, how much was actually due and unpaid at the time the premises were sold, July 2, 1912; that the trustee in bankruptcy is not bound or concluded by that agreement which was the result of a mutual error in computation. No such agreement made by D. B. Howard, one of the obligors in the bond, can make the lien greater than it actually is. A mortgage lien on the real estate of a bankrupt, as against his creditors, cannot be created in that way. This bond and agreement were not of record and neither of the assignments were recorded. Geo. A. Howard may have a remedy against Mitchell or a claim against the estate of D. B. Howard, but the actual lien is the true amount due and unpaid on the bond and mortgage.

[5] It seems that after November 1, 1907, when the bond and mortgage became the property of Geo. A. Howard, he received the rents of the property, and that after deducting from the rents received the amounts paid for repairs, taxes, etc., and also the amount of a note of D. B. Howard paid by Geo. A. Howard therefrom, the balance of rents was applied on the two bonds and mortgages; a certain part being applied to the one and the remainder to the other. This was done by agreement, and this they had the right to do. If Geo. A. Howard had taken possession of the premises as mortgagee without agreement, the net rents and profits derived would go entirely in reduction of the bonds and mortgages, but this was not the situation or the arrangement. The property was owned by D. B. Howard, subject to the mortgages, and when he let Geo. A. Howard into control or possession, retaining the right to have some part of the rents applied to other indebtedness, the parties were acting within their rights, and hence the objection of the trustee that it was not proper or legal to pay such note from the rents, and that the amount so paid, $105 or $100, must be credited on the bond or bonds, cannot be sustained. On examination of the account for rents received and expenses paid, I do not find that there was any failure to apply the net rents in reduction of the bonds and mortgages. Of course the net rents received by Geo. A. Howard after the last application of rents and down to July 2, 1912, must be applied on such bonds and mortgages. It seems from the evidence that the last application was made November 21, 1911, and that

thereafter Geo. A. Howard received of rents to apply on both bonds and not applied the following sums: December 2, 1911, $20; January 3, 1912, $20; February 2, 1912, $20; March 2, 1912, $20; April 2, 1912, $20; May 2, 1912, $20; June 2, 1912, $20; and July 2, 1912, $20—total, $160. The expenses, repairs, taxes, etc., during the same time seem to have been $21.83. There is some discrepancy in the exhibits and some confusion in the testimony, but I find after the best computation I am able to make on the conflicting statements and exhibits that July 2, 1912, when the premises were sold, there was due and unpaid on both bonds and mortgages the sum of $1,555.24.

March 30, 1907, T. W. Stevens and Chas. E. Hills obtained a judgment against said D. B. Howard for $143.83, which was docketed in Otsego county clerk's office August 23, 1907, and became and is a lien on the premises and the proceeds of sale, and with interest to July 2, 1912, amounts to $189.14. Total liens at that date, $1,744.38.

[6] The voluntary petition in bankruptcy was filed on the 5th day of February, 1910, and there was an immediate adjudication, and Arthur H. Abell was duly appointed trustee and duly qualified. In his schedules attached to his petition, the bankrupt placed the value of the real estate owned by him, and mortgaged as above stated, at $3,000. He had no other property. The trustee demanded the rents of the real estate but, finding the mortgagee in control and possession, was unable to obtain them. I hold that, as against the trustee in bankruptcy and general creditors, this possession under the agreement was rightful and that the mortgagee was entitled thereto. The question of the inchoate dower right of Mrs. D. B. Howard has been presented. As this first mortgage was a purchase-money mortgage and the second one was signed by Mrs. Howard, no such dower interest attaches to the proceeds of sale except the surplus after deducting the amount due and unpaid on the two mortgages. The trustee has eliminated this question by obtaining from the wife of D. B. Howard a release of this dower interest.

[7, 8] The referee made an order on application of the trustee authorizing a sale of this property free and clear of all incumbrances. A sale was made which the referee declined to confirm and a resale was ordered. Thereupon a stay was obtained but subsequently dissolved, and on the resale the mortgagee and judgment creditors mistakenly and improperly interfered with the sale, in effect asserting and claiming to those present and to would-be purchasers that the orders of the court were improper and ineffectual and that whoever purchased and paid his money to the trustee for a clear title would be compelled to pay the liens in addition. Thereupon a motion was made to punish for contempt, etc. The court ordered a resale and enjoined further interference. Thereupon a sale was had, the highest bid being $1,800, but an offer of $1,825 at private sale was made, and this was accepted, confirmed by the court, and the money paid into court. I have only briefly referred to these proceedings. The trustee was all the time claiming that the premises were worth at least $2,000 and that much less was due and unpaid on the two mortgages than in fact was due and unpaid, while the mortgagee Geo. A. Howard was

claiming that more was due and unpaid than in fact was. The highest offer made at any time was $1,825, and this court has no evidence justifying a conclusion that the premises were or are worth a greater sum. Prior to any sale the mortgagee Geo. A. Howard stipulated in writing, the trustee signing same, that an order might be made for the sale of such property free and clear of all incumbrances; the liens to attach to the proceeds, "with the exception that said lien or liens shall not attach to $30 of said proceeds, which it is hereby stipulated shall be allowed as the expense of the trustee in making the sale of said property and advertising the same."

It is now contended on the one hand that this limits and controls the allowance the court can make out of the proceeds of sale, while on the other it is contended that the court can make allowances to cover not only the actual expenses of all the sales but of ascertaining the amount due on the liens and those incident to such contempt proceedings, and also the expenses of administration in the bankruptcy court, including the referee's costs and expenses and commissions and the commissions of the trustee, and also an allowance to the attorney for the trustee for services in connection with the sales and ascertainment of the amounts due on such liens. By selling free and clear of incumbrances or liens, the owner of the mortgages has been saved the expense of foreclosure and a possible allowance to the attorney for the trustee, although no defense to such mortgages is claimed. The owners of the judgment have been saved the expense of advertising and selling on execution. The expenses of selling have been more than doubled by the unjustifiable acts of the lienors at the sale referred to, making another sale necessary. The trustee delayed a sale for about a year after being authorized to make one, allowing the interest to accumulate and absorb the proceeds of sale when made, and he has made a contention as to the construction of the bonds and as to the amount due and unpaid, which is not sustained. This controversy should end. As the result shows, the trustee was justified in asserting and claiming that there was some equity in this real estate. If the parties had got together, figured up the amount due and unpaid on the mortgages, the net amount received for rents and applicable thereto, and consented to and aided a sale on the best possible terms and at the earliest possible moment, and had submitted the construction of the bonds and mortgages to the court, a vast amount of trouble, delay, bitterness, and expense might have been saved.

This court takes the case as it finds it. All parties, both lienors and the trustee, have been more or less in the wrong, taking untenable positions, and I think that in view of all the facts, but briefly referred to, the allowances should cover the necessary expenses of selling the property, all the sales, and no more.

[9] The bankruptcy court cannot order mortgaged premises sold free and clear of the lien of the mortgage and use the proceeds of such sale, properly applicable to the payment of the mortgage, to pay the general expenses of administering the estate in bankruptcy, but I do not doubt its power to order and make a sale free and clear of the mortgage, bring the proceeds into court, ascertain the amount actually due and owing on the bond and mortgage, and make proper allowances

for the necessary expenses of so doing. It would be a perversion of justice to hold that a person may mortgage his real estate for more than its value or for substantially its full value to a mortgagee who takes and holds his lien for full value and in good faith, then go into voluntary bankruptcy, having no other assets, and have the real property sold and its proceeds applied first to the payment of the expenses of administration, thus clearing him from all his unsecured debts and the balance of the secured debts, over and above the amount of the proceeds of the mortgaged property, less such expenses, at the expense of the holder of such security. It is plain that the reasonable and necessary expenses of selling the mortgaged property of the bankrupt, when there is an equity for the bankrupt's estate, are on a different footing. If the court in bankruptcy has jurisdiction to sell the real estate free and clear of the incumbrances, as it has, and ascertain the amount of the lien, it may charge such fund with the reasonable and the necessary expenses of selling. The mortgage itself provides for a sale, and, in case the bankrupt has other assets, the owner of the bond and mortgage can prove and have allowed his claim for the deficiency. In Re Williams' Estate, Anheuser-Busch Brewing Ass'n v. Harrison, 156 Fed. 934, 84 C. C. A. 434 (C. C. A. 9th Circuit), the court held:

"The proceeds of property of a bankrupt, covered by valid liens and sold by the court of bankruptcy by request or consent of the lienholders, who subsequently filed their claims in such court, which were allowed as secured claims in an amount in excess of such proceeds, are properly chargeable with the costs of such court appropriate to the enforcement of the liens, but not with general costs of the administration of the estate, such as the general fees of the trustee and his attorney, or for the services of a receiver in carrying on the business of the bankrupt and his attorney, or for the expenses and losses of such business. * * * By coming into the bankruptcy court, therefore, the holder of a valid lien upon the estate of a bankrupt comes into an appropriate place and into a court amply able to enforce and protect his rights. By doing so the lienholder waives none of his rights. The enforcement of his lien in another court would entail upon the proceeds of the property upon which the lien exists the payment of the appropriate court costs; and so, in the enforcement of such lien in a court of bankruptcy, the proceeds of the property of the bankrupt upon which such lien exists is properly chargeable with the costs of such court appropriate to such enforcement, but with no other or further costs. They are not chargeable with the general costs of the administration of the bankrupt's estate, such as the services of a receiver in carrying on the business of the bankrupt, the expenses and losses of such business, the fees of the attorney for such receiver, the general fees of the trustee or those of his attorney. If so, the valid lien upon the estate of the bankrupt, which the bankruptcy act expressly declares shall be unaffected by any of its provisions, might very readily be destroyed, as it would unquestionably be should such costs equal or exceed the proceeds in cases like the present, where the aggregate amount of the valid liens exceeds the proceeds of the entire estate of the bankrupt."

In Re Utt et al., Ridgely Nat. Bank v. Matheny, 105 Fed. 754, 45 C. C. A. 32 (C. C. A. 7th Circuit), there were two mortgages. The syllabus says:

"A decree was entered in a state court foreclosing a first and second mortgage on real estate and ordering its sale. Before the time fixed for the sale, creditors filed a petition against the mortgagors, on which they were adjudicated bankrupts. Such creditors also filed a bill in the Circuit Court of the

United States on which they obtained an injunction restraining further proceedings for the sale of the mortgaged property by the state court. Thereafter the mortgagees joined in a petition to the court of bankruptcy asking that the property be sold by the trustee for payment of their liens, and such sale was ordered and made; the proceeds received being insufficient to pay the mortgage debts. On petition of the trustee the court ordered the first mortgage paid from the proceeds but displaced the second in favor of the costs and expenses incurred in both the bankruptcy proceedings and the injunction suit, including fees allowed to counsel for the creditors and trustee. No other assets of the bankrupt came into the hands of the trustee. *Held*, that such order was erroneous, except in so far as it directed payment of the costs incurred in selling the property, including compensation to the trustee, not exceeding that to which the master in the state court would have been entitled."

To the same effect is In re Bourlier Cornice & Roofing Co. (D. C.) 133 Fed. 958, 963.

In Re Prince & Walter (D. C.) 131 Fed. 546, 552, the court said:

"A sale of the property free of liens may undoubtedly be ordered, but, if this is done, the proceeds must be applied to their satisfaction, undiminished by anything except the costs of sale, or the expenses, if any, which have been undertaken for, and result to, their benefit. They are not concerned with the bankruptcy proceedings outside of this and cannot therefore be charged with the cost of instituting them or carrying them on."

I have examined In re Erie Lumber Co. (D. C.) 150 Fed. 817, and In re Tebo (D. C.) 101 Fed. 419, and do not agree with the conclusions there reached.

In Re Zehner (D. C.) 193 Fed. 787, it was held:

"Where mortgaged property of a bankrupt is sold free from liens in bankruptcy proceedings, it cannot be charged with the expenses of the sale or fees of the referee in bankruptcy, but the mortgage creditor may be required to contribute to the charges and expenses of sale an amount not exceeding what he would be required to expend to foreclose his mortgage in the state courts."

It would be unjust in the extreme to permit trustees in bankruptcy to urge a sale of mortgaged premises in the bankruptcy court, there being no other property, allow him to set up and litigate all sorts of untenable claims, and then not only pay the expenses of sale but large counsel fees and the general expenses incurred from the proceeds of the mortgaged property. In this way mortgage liens could, in many cases, be annihilated. In this case it is just and proper, in view of the unlawful, improper, and unjustifiable interference with the sale, in which the holders of the judgment lien participated, that they bear some portion of the expense of the sale finally accomplished and which demonstrates that there was an equity for the estate in this property. But for the attitude taken by these lienors there would have been a sale long before it was made, and but for the attitude of the trustee there would have been an earlier distribution. If an appeal is taken and it is held that this court is wrong in holding that the bonds and mortgages draw interest from date on the full principal instead of on the installments only until the whole principal became due, there will of course be a readjustment of the whole matter, and it may be that in such event the trustee would be entitled to compensation for his attorney as against the lienors. In such an event there would be an es-

tate for distribution to general creditors wrested from the claims of the owner of the mortgage, and it might be proper to charge such owner with attorney's fees. But it is unwise to speculate on what may be.

[10] One question remains and that is whether or not the trustee and referee are entitled to commissions on and from the proceeds of such sale, $1,825, in reduction of the amount otherwise going to the lienors.

When this bankruptcy proceeding was instituted February 5, 1910, the amendatory act of June 25, 1910, which made changes as to the compensation of trustees, was not in force, and by express provision the amendments "shall not apply to bankruptcy cases pending when this act (1910) takes effect." As amended in 1903, the act provided that referees should receive "from estates which have been administered before them one per centum commissions on all moneys disbursed *to creditors* by the trustee," etc. Section 40a. Section 48a, relating to the compensation of trustees, provided that trustees should receive from estates *which they have administered "such commissions on all moneys disbursed * * * by them, as may be allowed by the courts*, not to exceed," etc. There was a division of opinion whether or not this gave commissions to trustees on moneys received by them and disbursed by them which were derived from the sales of mortgaged property and which moneys were covered by and properly applicable to the payment of the lien. Since the amendatory act of 1910, section 48a provides that trustees shall receive "such commissions on all moneys *disbursed or turned over to any person, including lienholders,* by them, as may be allowed," etc. This amendment settled the disputed questions as to the effect of the amendment of 1903, so far as trustees are concerned. See Smith, as Trustee, v. Township of Au Gres, 17 Am. Bankr. Rep. 745, 150 Fed. 257, 80 C. C. A. 145, 9 L. R. A. (N. S.) 876 (C. C. A. 6th Circuit), holding one way, and In re Cramond (D. C.) 17 Am. Bankr. Rep. 22, 145 Fed. 966, and In re Sandford Furniture Mfg. Co. (D. C.) 126 Fed. 888, 11 Am. Bankr. Rep. 414, holding the other. In 1 Loveland on Bankruptcy, 752, § 365, it is said:

"Prior to the amendment of 1903, the courts generally held that the trustee was not entitled to a commission on money paid to secured creditors but was limited to 'commissions on sums to be paid as dividends' to unsecured creditors. This rule was changed by the act of 1903, which provided for commission 'on all moneys disbursed.' This was held to authorize a commission on moneys derived from the sale of property subject to liens. That this construction is the true one is settled by the act of 1910 which inserts in section 48 the words 'or turned over to any person, including lienholders.'"

In re Torchia (D. C.) 185 Fed. 576, and In re Meadows (D. C.) 199 Fed. 304, arose and were decided subsequently to the amendment of 1910. The decision in Smith v. Township of Au Gres, supra, made no reference to the other cases cited; the court saying:

"The trustee complains that the consequence of the order of the District Court is that he is thereby deprived of compensation for his services. But the proceeds of the sale have left no surplus for the bankrupt's estate, and the township is not chargeable with the expenses of administering the estate. What remedy the trustee, the referee, or other officers who have rendered

services in the matter of the estate have against the petitioning creditors we are not called upon to inquire."

It will be noted that, while amending section 48a so as to insure commissions to the trustee in the discretion of the court, no amendment was made to section 40, relating to the compensation of referees. It is plain that Congress has made and intended to make a distinction between the allowance and payment of commissions to trustees in the case of distributions of moneys subject to specific liens and which come into possession of the bankruptcy court by the sale of mortgaged property free and clear of incumbrances or liens. In any event, being in a court of equity, equitable principles must be applied and govern here. The cases make a distinction between instances where the lienors consented to the sale by the court in bankruptcy and those where they did not; those where there was reasonable ground to believe there was a substantial equity for the estate and those where there was not; and those where there were honest differences and controversies over the amount due and unpaid and those where there were not. Lienors cannot equitably be required to pay expenses incurred by a trustee in an unsuccessful effort to benefit the general creditors. This subject is thoroughly discussed and was ably and intelligently considered by the Circuit Court of Appeals in the Third Circuit in Re Vulcan Foundry & Machine Co., 24 Am. Bankr. Rep. 825, 180 Fed. 671, 103 C. C. A. 637, and to an extent in Re Torchia, 26 Am. Bankr. Rep. 579, 188 Fed. 207, 110 C. C. A. 248, on appeal from the District Court. In Re Torchia, 26 Am. Bankr. Rep. 579, 188 Fed. 207, 110 C. C. A. 248, the objections to allowances were overruled as the lienors made no objection to the sale by appeal or otherwise from the order directing it, and the court said:

"To use a phrase of the Vulcan Foundry Case, they consented by necessary implication to all that was done, and their belated objections cannot now be regarded with favor."

The syllabus in the Vulcan Foundry & Machine Co. Case, supra, is as follows:

"Property of a bankrupt, subject to two mortgages, was sold by the trustee, the order of sale providing that the second mortgage should be divested; but, if the second mortgagee became the purchaser, he should pay in $500 in cash to be applied to any expenses that might properly be charged against the fund, the balance of the mortgage to be used on the bid. The second mortgagee purchased for the amount of his mortgage. The trustee had expended certain sums for the benefit of the general creditors in preserving the estate and paying interest on the first mortgage, but without the consent of the second mortgagee. These expenses, amounting to about $4,000, were charged against the purchaser. *Held* that, the mortgagee having purchased in compliance with and under the protection of the order of sale, the court could not afterwards change its order at the expense of the purchaser.

"The expenses having been incurred solely for the benefit of the general creditors and without the consent of the mortgagee, the lien of the mortgagee was prior thereto."

The court said:

"It is no doubt true that the federal tribunals support the power of the District Court to sell a bankrupt's real estate discharged of liens, and to that extent the position of a lien is undoubtedly affected, but care is always

taken to protect the liens by transferring them to the fund produced by the sale, and their virtual ownership of the property is thus effectively admitted. It is also true that in some cases certain expenses have been charged against lienholders (for example, the expense of selling the incumbered property), and such a charge may no doubt be warranted under some conditions. * * * But where it is sought to charge a lienholder with the cost of preserving and administering the incumbered property, as distinguished from the cost of its sale, it becomes necessary to consider the particular situation with great care, paying due regard to the rights of those who are in equity part owners of the property, for they cannot be deprived of their valuable interest except in strict accordance with legal or equitable rules. Especially is this true when a lienholder stands upon his lawful rights and does not assent, expressly or by necessary implication, to the acts for which he is afterwards asked to pay. To make such charges a prior lien upon the fund produced by a sale in effect compels an owner to pay for what he has never ordered (may indeed have strenuously opposed) and, under the guise of protecting his interests, may perhaps impair them seriously. Bankruptcy proceedings take place in a court of equity, and it should always be remembered that holders of valid liens have a statutory right to preferred treatment. If the receiver or trustee has a reasonable belief that the property is worth substantially more than the liens, it may no doubt be his duty to preserve this equity for the general creditors. But, speaking generally, since such steps as may be taken for this purpose are in the interest of these creditors, the cost should be paid by them and not by the lienholders, whose debts, indeed, are often perfectly secure, and receive no benefit from such effort as may be made to turn the equity into cash. We do not attempt to lay down a general rule to cover all cases. This would obviously be impracticable, but we think it is safe to say that the holders of liens are ordinarily entitled to judge for themselves what their interests may require, and that these interests cannot be affected without their consent in the effort to benefit persons whose rights are inferior to their own."

[11] The case now before this court is somewhat similar. The owner of the mortgages consented to an order by the referee that the sale be made free of liens, the liens to attach to the proceeds, but with a limitation on the expenses to be deducted. This limitation is not binding as there was the unwarranted interference with the sale before referred to. I am of the decided opinion that the court and not the lienors is to decide whether the property, the title to which vests in the trustee subject to the liens, shall be sold free and clear of incumbrances, and when this is done by order of the court, as a necessary incident to the proper marshaling of the assets, the expenses of the sale must be incurred. But the expenses must be reasonable and necessary.

[12] If the lien asserted by the mortgagee is largely in excess of the true amount due and unpaid or there is reasonable ground to so believe, it stands to reason that the trustee may contest the claim. If successful he has a fund and the court may, in the exercise of its equitable powers, charge some portion or even all the expense, including attorney's allowance, in ascertaining the amount due against the fund that would otherwise go to the lienors. To say that a court of equity cannot protect the estate against the unjust claims of a lienor is to say that a court of equity, in exercising its jurisdiction, is powerless to do equity, governed of course by equitable rules and principles. On the other hand, trustees cannot experiment or litigate unsuccessfully at the expense of lienors. If they do litigate they take the chances and before entering on the enterprise should see to it that they

are indemnified' for expenses in case of defeat by the creditors who are to be benefited in case of success. Here was a somewhat complicated situation and both parties to an extent went wild, so to express it. The bankrupt in the first instance exaggerated the value of the property in his schedules. Later the lienors, as stated, interfered with the trustee in the discharge of his duty in executing the lawful orders of the referee and court, not appealed from or sought to be reviewed. But at the same time the trustee took an untenable position. The referee necessarily gave some time to making orders and in taking evidence as to the true amount of the mortgage liens. The trustee and his attorney have worked hard and faithfully to sustain a position which this court holds untenable. The trustee is not entitled to any large compensation for merely receiving and paying out this fund which in equity, subject to reasonable charges, belongs to the lienors. The holders of the judgment lien must share in this expense which was made necessary by their unwarranted interference with the sale ordered by the court. Thirty dollars will be allowed to the referee, Benjamin Baker. Twenty dollars will be allowed to the trustee, Arthur H. Abell, commissions. One hundred twenty dollars and eighty-five cents will be allowed to the trustee for necessary expenses of his attorney attending court in connection with the sales and in entering orders and advertising such sales and for postage, etc., and $75 for his attorney's services in preparing orders and notices and order to show cause and reports of sale and orders of confirmation, etc.; said sums of $120.85 and $75 to be paid to Vere H. Multer, his attorney, who has paid such disbursements and performed such services. The amounts thus allowed, aggregating $245.85, will not much exceed, if they do exceed, the necessary expenses of a foreclosure and sale in the state court. Applying the equity of the estate in these proceeds, the difference between $1,825 and $1,744.38, the amount of the liens, or $80.62, to the payment of these allowances leaves $165.23 to be borne by the owner of the mortgage and the owners of the judgment, of which sum the judgment lien will be charged $50 and the mortgage lien $115.23.

Distribution of the proceeds of such sale will therefore be made as follows:

There will be paid to Benjamin Baker the sum of.................$   30 00
To Arthur H. Abell, the sum of................................     20 00
To Arthur H. Abell or to V. H. Multer, his attorney, the sum of....   195 85
To Geo. A. Howard on his mortgages, the sum of.................  1,440 01
To T. W. Stevens and Chas. E. Hills, the sum of.................    139 14
                                                                ─────────
    Total ...................................................$1,825 00

If such fund has earned any interest since the sale, same will be distributed to such lienors in proportion. There will be an order accordingly.